**Rod MILLER, Plaintiff,**

v.

**Robert SPICER, M.D., and Beebe Medical Center, Defendants.**

**Civ. A. No. 90–586 MMS.**

United States District Court,
D. Delaware.

May 7, 1993.

Barbara J. Gadbois, of Ament, Lynch & Carr, Wilmington, DE, for plaintiff Rod Miller.

John A. Elzufon, and Cathy A. Jenkins, of Elzufon, Austin & Drexler, P.A., Wilmington, DE, for defendant Robert Spicer, M.D.

Richard F. Stokes, Esq., of Tunnell & Raysor, Georgetown, DE, Of Counsel: Stephen A. Ryan, of Stephen A. Ryan, P.C., Bala Cynwyd, PA, for defendant Beebe Medical Center.

### OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

## I. INTRODUCTION

Defendants Robert Spicer, M.D., and Beebe Medical Center ["Beebe"] move for partial summary judgment on the issue of liability as to three of the claims asserted in plaintiff Rod Miller's complaint. For the reasons which follow, summary judgment on the issue of liability will be granted in favor of Dr. Spicer on plaintiff's claim defendants discriminated against him on the basis of his perceived human immunodeficiency virus ["HIV"] status in violation 29 U.S.C. § 794 (1988). Defendant Beebe's motion for summary judgment on this claim will be denied. Both defendants' motions for summary judgment on the issue of liability will be denied as to plaintiff's claim for intentional infliction of emotional distress. Summary judgment on the issue of liability will be granted in favor of both defendants as to plaintiff's claim for breach of contract.

## II. FACTS

On June 28, 1987, plaintiff injured his foot and sought medical treatment at Beebe Medical Center's emergency room. Docket Item ["D.I."] 84 at B-41-42. Beebe employee Dr. Paul Emory diagnosed the injury as a lacerated tendon. He informed plaintiff that immediate surgery was necessary and that if surgery was not immediately performed, the tendon would not heal correctly and plaintiff's ability to walk could be permanently impaired. D.I. 84 at B-43. Hospital staff began to prepare the plaintiff and an operating room for the surgical procedure. D.I. at B-40, B-44.

Emory contacted Dr. Spicer, a surgeon with staff privileges at Beebe, who was then performing surgery in one of Beebe's operating rooms. D.I. 78 at A-26c; D.I. 98 at B-90. At or about the same time, some other unidentified Beebe employee also contacted the operating room being utilized by Spicer with a derogatory comment about plaintiff or plaintiff's companions that was apparently meant to be a joke. Intending to communicate that plaintiff and/or his companions were homosexual, the Beebe employee told those in the operating room that someone had come into the emergency room with "broken wrists." D.I. 98 at B-100. Thereafter Spicer reported to the emergency room to consult on plaintiff's treatment. Dr. Emory "whispered" to Spicer that plaintiff was homosexual. D.I. 98 at B-92. Spicer testified that aside from these incidents his belief that plaintiff was homosexual was based on his own observations of one of plaintiff's companions who, according to Spicer, demonstrated a gay affect. D.I. 84 at B-99-100.

Spicer then examined plaintiff in a manner that was brusque and rough. D.I. 78 at A-27. He questioned plaintiff, "Do you have any ailments?" When plaintiff responded in the negative Spicer again, more angrily asked plaintiff, "Do you have any ailments?" Receiving the same negative response Spicer then addressed a question to plaintiff's friends as well as plaintiff, "Okay. Look fellows, you're going to have to level with me. You're going to have to tell me whether he has AIDS." D.I. 78 at A-28.

Mr. Miller informed Spicer that he had had an "AIDS test" but that he did not know the results. D.I. 78 at A-29. Spicer was "bugged" by the fact that plaintiff did not know the results of his test. D.I. 84 at B-97. He testified in deposition that when plaintiff indicated he didn't know the results of the test, it was the "turning point in my relationship [with the plaintiff]." D.I. 84 at B-104.

Spicer requested Beebe employees to attempt to ascertain the results of the test, but they were unsuccessful. D.I. 98 at B–44, B–49. Spicer then told plaintiff that because he could not obtain the results of plaintiff's AIDS test, Spicer would not perform the required surgery. D.I. 98 at B–49. Spicer has admitted that his determination to transfer the plaintiff rather than treat him was motivated by his inability to confirm plaintiff was HIV negative. He stated that he had to protect the women (nurses) in the operating room from the possibility the plaintiff might have AIDS. D.I. 78 at A–31, A–38. Spicer acknowledged that he transferred plaintiff to plaintiff's home town of the District of Columbia because "they take care of gay people." D.I. 84 at B–107.

Spicer arranged for a helicopter to transport plaintiff to George Washington University Medical Center. D.I. 84 at B–104, 106. After transportation was arranged Dr. Emory returned "sheepishly" to the emergency room to perform what Emory himself called the "dirty job" of informing plaintiff that he would be air lifted to the District of Columbia. D.I. 84 at B–48, B–50. Thereafter Dr. Emory inscribed on plaintiff's chart the phrase, "known admitted homosexual." D.I. 98 at 18–A. Plaintiff was not a known admitted homosexual; he had never been asked whether he was homosexual. D.I. 98 at B–54, B–97.

It appears that Dr. Emory could have taken efforts to prevent the allegedly discriminatory transfer of plaintiff if he so chose. Testimony shows that where an emergency room doctor employed by Beebe disagreed with the treatment plan of a "independent contractor" doctor such as Spicer, he can take steps such as contacting the chief of staff of the emergency room. D.I. 98 at B–22A–22B. Dr. Emory took no such action.

In the two hour period during which plaintiff awaited the helicopter, he began to complain that he was being denied treatment because of his perceived sexual orientation and HIV status and demanded to see his chart. D.I. 84 at B–12, B–52–54. When Nurse Burton showed him his chart he saw that the words "known admitted homosexual" had been written on it. D.I. 84 at B–54.

When plaintiff protested about being labelled homosexual without any basis and that his perceived sexual orientation and HIV status were the reasons for his transfer, Nurse Burton, with the knowledge of her supervisor Nurse Soots, telephoned Dr. Spicer at home. Spicer told her the reason for plaintiff's transfer was that he, Spicer, "didn't do" tendon repairs. D.I. 84 at B–67; D.I. 98 at B–13. Dr. Spicer has subsequently admitted that he has performed thousands of tendon repairs. D.I. 98 at B–94. In Burton's telephone call to Spicer, he declined to comment on plaintiff's accusations. D.I. 98 at B–21.

The nurses' actions appear to be in contravention of Beebe's antidiscrimination policy. The policy directs a nurse receiving a complaint of discrimination, including discrimination based on HIV status, to contact her nursing supervisor, here Nurse Soots. The supervisor is directed to contact the doctor in question. If she does not receive a satisfactory response from him or her, she is directed to contact the chief of service and the chief of staff who are charged with taking appropriate action. D.I. 92 at A–28–29; D.I. 98 at B–69A. The supervisor, Nurse Soots took no such action.

Plaintiff was subsequently air lifted to the District of Columbia. However, rather than being helicoptered to George Washington University Medical Center as he should have been, plaintiff was deposited at Georgetown University Hospital and was later taken to George Washington by ambulance. D.I. 84 at B–55. By the time plaintiff finally arrived at George Washington he was told that his foot was now so swollen it was impossible to perform a proper examination, much less surgery. D.I. 78 at A–33. Surgery was performed eight days later. *Id.* Plaintiff apparently now has permanent injury to his foot. D.I. 98 at B–37–39.

### III. *STANDARD FOR SUMMARY JUDGMENT*

Federal Rule of Civil Procedure 56(c) provides that summary judgment

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Fed.R.Civ.P. 56(c). The entry of summary judgment is inappropriate where there exists a genuine and material issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). An issue is genuine if a "reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510. A fact is material if, under the relevant substantive law, determination of such fact might affect the outcome of the case. *Id.*

In determining if there exists a genuine issue of material fact, the Court should refrain from credibility determinations, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and instead draw all inferences in favor of the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, if the movant demonstrates the absence of a genuine issue of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts" to prevent its entry. *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56. It is not sufficient for the party opposing summary judgment to provide a mere scintilla of evidence supporting his or her case. *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512.

The moving party has the initial burden of identifying those parts of the pleadings, depositions, answers to interrogatories, admissions and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to demonstrate the presence of a genuine issue of material fact. If the non-movant is the party who will bear the burden of proof at trial, that party must show it will not be impossible for him or her to establish the existence of that element essential to his or her case which has been challenged by the movant. *Id.* at 322–23, 106 S.Ct. at 2552–53; *Childers v. Joseph*, 842 F.2d 689, 694 (3d Cir.1988). If the non-movant fails to do so, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## IV. DISCUSSION

Defendants here challenge three of the claims in plaintiff's complaint. Both defendants seek summary judgment on the issue of liability on plaintiff's claim for violation of 29 U.S.C. § 794 (1988) (the Rehabilitation Act of 1973), his claim for intentional infliction of emotional distress and on plaintiff's breach of contract claim. The Court will address each seriatim.

### A. The Rehabilitation Act

Plaintiff complains both defendants discriminated against him because they perceived him to be homosexual and thus to pose an HIV contamination risk. Plaintiff claims such discrimination violates section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (1988). Defendants attack plaintiff's claim on two grounds. First, they contend plaintiff cannot make out a prima facie case under the act. Second, even if plaintiff could make out a prima facie case, argue defendants, no private cause of action for monetary damages exists under section 504.

#### 1. Plaintiff's Prima Facie Case

The Rehabilitation Act of 1973 prohibits federally funded programs or activities from discriminating on the basis of handicap or

perceived handicap.[1]  29 U.S.C. §§ 706(8), 794 (1988 & Supp.1990).

Section 504(a) of the Rehabilitation Act provides:

> No otherwise qualified individual with handicaps in the United States, as defined in section 706(8) of this title, shall, solely by reason of his or her handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794 (1988).  For plaintiff to make out a prima facie case under the Act he must show:

> (1) that he is a handicapped under the Act;
>
> (2) that he is otherwise qualified;
>
> (3) that the relevant program received federal financial assistance;  and
>
> (4) that the defendants' refusal to perform surgery impermissibly discriminated against him on the basis of his physical handicap.

*Bonner v. Lewis*, 857 F.2d 559, 562 (9th Cir.1988).[2]

Defendant Spicer asserts plaintiff cannot prove the third element, that the relevant program received federal financial assistance. Defendant Beebe asserts plaintiff cannot prove element number four, that Beebe's refusal to perform surgery impermissibly discriminated against plaintiff on the basis of his handicap.

### (a) Defendant Spicer

Defendant Spicer asserts there is no evidence in the record as to element number three of plaintiff's prima facie case.  Because Spicer is not an employee of Beebe, D.I. 86 at C–1, the Court looks not to federal funding received by Beebe, but that received by Spicer.

The record is silent as to whether Dr. Spicer received any federal funding.  In response to Spicer's contention that the record contains nothing to support plaintiff's claim, plaintiff has failed to identify anything in the record establishing the existence of the third element of his case.  Plaintiff's failure to identify evidence in the record supporting an element essential to his case causes this Court to find no genuine issue of material fact exists and that defendant Spicer is entitled to summary judgment as a matter of law on plaintiff's Rehabilitation Act claim.  *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### (b) Beebe Medical Center

Defendant Beebe asserts plaintiff cannot make out a prima facie case because he cannot prove Beebe's failure to perform surgery on Mr. Miller impermissibly discriminated against him on the basis of his handicap.  Drawing all inferences in favor of the plaintiff as non-movant, an issue of fact exists as to whether plaintiff can establish element four of his prima facie case.  Defendant Beebe's motion for summary judgment will, therefore, be denied.

---

1. The Rehabilitation Act prohibits federally funded programs or activities from discriminating against an individual with handicaps including those who are *regarded* as having "a physical or mental impairment which substantially limits one or more of such person's major life activities."  29 U.S.C. § 706(8)(B) (1988 & Supp. 1990).  Thus, plaintiff's claim that he was discriminated against because he was *perceived* as being HIV positive falls within the scope of the Act.

2. The "relevant program" language of element three refers to the holding of the Supreme Court that section 504's prohibition against discrimination by any "program or activity" receiving federal funds was limited to the *specific* part of the program which received such funds.  *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984).  Thus, if one portion of a multi-component entity received federal funding, only that specific portion would be subject to the strictures of section 504, while other portions of the entity could discriminate on the basis of handicap without violating the Act.  *See also, Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984) (same interpretation of same phrase in context of Title IX).  A 1988 amendment to section 504 made it clear that this program specific approach was no longer to be followed.  Rehabilitation Act of 1973, Pub.L. No. 99–506, 100 Stat. 1807, 1810, 1844 (current version at 29 U.S.C. § 794 (1988)).  This Court declines to decide whether the 1988 amendment applies to conduct occurring in 1989.  Whether the "program specific" mode of analysis is used or the entire activity is considered in deciding whether element three can be met, the outcome in this case is the same.

In support of its assertion, Beebe relies on the nature of the relationship between itself and Dr. Spicer. Beebe notes that as a hospital it lacks the physical ability to perform surgery, as surgery can only be performed by a skilled human being. Beebe asserts it was only Dr. Spicer who had control over whether Mr. Miller's injuries would be treated and that it was only Dr. Spicer's decision to turn the patient away that constituted discrimination. Thus, claims Beebe, because only Dr. Spicer's actions constituted discrimination and because an independent contractor relationship existed between Spicer and Beebe, Dr. Spicer's discrimination cannot be attributed to Beebe. If Spicer's alleged discrimination cannot be charged to Beebe, it urges it cannot not be found to have discriminated against its patient.

In *Glanz v. Vernick,* 756 F.Supp. 632 (D.Mass.1991), a hospital was found liable for the discriminatory actions of its doctor on the basis of *respondeat superior.* However, unlike the physician in *Glanz,* Dr. Spicer was not an employee of Beebe, and there is no evidence in the record demonstrating Beebe maintained such control over Dr. Spicer's actions so as to make application of *respondeat superior* appropriate. Thus if Beebe is to be found liable for discriminating against Mr. Miller, it must be because of its own actions, not those of Dr. Spicer.[3]

Contrary to Beebe's assertion, however, such evidence does exist. Read most favorably to plaintiff, there is evidence in the record that Beebe employees knew or should have known that the cause of Mr. Miller's transfer from the hospital was not inability to treat, but plaintiff's perceived sexual preference and HIV status. Armed with this knowledge Beebe did nothing to prevent the transfer of plaintiff for discriminatory rather than medical reasons. Viewing the evidence in the light most favorable to the plaintiff,

Beebe employees had the ability and the duty to dismantle the discriminatory treatment plan apparently devised by defendant Spicer with the complicity of Beebe employee Dr. Emory. On the current record, rather than providing plaintiff with adequate medical treatment, Beebe facilitated the discriminatory transfer. This combination of acts and failures to act amounts to discrimination in violation of section 504.

The record indicates Beebe, through Dr. Emory and the nursing staff, knew of the discriminatory purpose behind Dr. Spicer's directive that Mr. Miller be transferred rather than treated. First, Beebe employees initiated and furthered the labelling of Mr. Miller as a potentially AIDS carrying homosexual which led to Dr. Spicer's eventual refusal to treat the patient. The rather unwitty and obviously derogatory message transmitted to the operating room in which Spicer was working prior to his meeting Mr. Miller, that someone in the emergency room had "broken wrists," apparently came from some unidentified Beebe employee. D.I. 98 at B–100. Dr. Emory's subsequent whispered accusation to Dr. Spicer that plaintiff was gay furthered the labelling of Mr. Miller as homosexual. D.I. 98 at B–92.

Moreover, it appears Beebe employees had direct knowledge of Dr. Spicer's discriminatory reasons for refusing to treat Mr. Miller. Dr. Spicer told the plaintiff that the reason he would not perform the operation was because plaintiff could not verify that he was HIV negative. It is not entirely clear from the record, but it appears that Spicer's statement to plaintiff regarding the reason for Spicer's refusal to treat was made in the presence of Beebe employees. D.I. 98 at B–49. It also appears Dr. Emory knew Dr. Spicer's determination to transfer plaintiff was based on plaintiff's perceived HIV sta-

---

**3.** Plaintiff makes passing reference in his brief to the concept of hospital corporate liability. Plaintiff states, "Clearly, Defendant Beebe is fully responsible for the discriminatory actions of its employees and staff in this case. Not only did Defendant Beebe hold itself out to the community as a provider of emergency surgical services, it specifically and expressly conveyed to Plaintiff that he needed emergency surgery and that Beebe would provide it." D.I. 97 at 29. The Court has not had the advantage of full briefing on the issue of hospital corporate liability, nor has the record been sufficiently developed. Suffice it to say that consideration of such a monumental change in the present allocation of liability would be inappropriate given the state of the record in this case, and in any event, might appropriately be a matter for the state legislature.

tus. After Spicer's refusal to treat, it was Dr. Emory who "sheepishly" arrived with what Emory himself termed the "dirty job" of informing plaintiff that he was being air lifted from Beebe. D.I. 98 at B–48, B–50. It can be inferred that Dr. Emory's sheepishness and his own description of his duties as "dirty work" resulted from the fact that he knew plaintiff's transfer was being effected for discriminatory reasons. When questioned by Nurse Burton, Emory refused to commit himself as to why he made the notation, "known admitted homosexual" on plaintiff's chart, instead referring Nurse Burton to Dr. Spicer for answers. D.I. 98 at B–25.[4] This indicates Spicer and Emory had communicated regarding plaintiff's perceived sexual orientation and HIV status and, presumably, the way in which these factors influenced plaintiff's treatment plan.

Viewing the summary judgment record most favorably to plaintiff, Beebe's nursing staff was also aware of the discriminatory reason for plaintiff's transfer. Some unnamed nurse had been requested by Dr. Spicer to obtain the results of plaintiff's AIDS test. She reported to Spicer that the results were unavailable just prior to Spicer's announcement that plaintiff should be transferred rather than treated. D.I. 84 at B–44. Later, Nurse Burton showed plaintiff his chart with the label "known admitted homosexual" written across the top. D.I. 92 at A–14–15. Plaintiff protested to Nurse Burton that the reason he was being transferred was because of his potential positive HIV status. *Id.* Nursing Supervisor Soots was also aware that plaintiff was complaining of being transferred because of his perceived HIV status. D.I. 98 at B–66. All of this demonstrates there is a probability that Beebe staff knew the reason for plaintiff's transfer was his perceived homosexuality and HIV status.

There is some evidence to the contrary. In response to plaintiff's protests that he was being transferred because of his perceived HIV status, Nurse Burton telephoned Dr. Spicer to verify the reason for Mr. Miller's transfer. D.I. 84 at B–13. Dr. Spicer informed Nurse Burton, who in turn informed

Nurse Soots, that the reason plaintiff was being transferred was because he, Spicer, "didn't do" tendon repairs. D.I. 98 at B–13; D.I. at 84 B–67. During that telephone conversation, Dr. Spicer apparently declined to comment on whether his determination to transfer plaintiff was in any way based on plaintiff's perceived HIV status. D.I. 98 at B–21. Contrary to his assertions on the telephone, however, Dr. Spicer has admitted he has performed thousands of tendon repairs. D.I. 98 at B–94. Because of the great number of such operations by Dr. Spicer, it can be inferred Beebe could not be without knowledge that Dr. Spicer performed such operations. Nonetheless, hospital staff apparently chose to credit Dr. Spicer's facile explanation and took no formal steps to deal with Mr. Miller's complaints of discrimination. In this regard, Nurse Soots testified that after being told Dr. Spicer's determination not to treat the plaintiff was because he "didn't do" tendon repairs, it just did not occur to her this lack of treatment resulted from discrimination. This, despite plaintiff's protestations to the contrary and the notation, unique in Nurse Soots's experience, written across the top of plaintiff's chart by Beebe employee Dr. Emory that plaintiff was a known admitted homosexual. D.I. 98 at B–69. Instead, Nurse Soots claims she believed the reason Mr. Miller was being transferred was because, "we did not provide what the patient required." *Id.* at B–69A. Drawing all inferences in favor of the non-moving party, as this Court must on a motion for summary judgment, *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356, the Court finds Beebe had reason to believe plaintiff was being transferred from its facility because of discriminatory reasons.

Faced with this knowledge, Beebe facilitated the discrimination rather than taking any action to prevent it. Hospital staff did not follow the hospital policy developed to address instances of alleged discrimination, including possible discrimination based on perceived HIV status. This policy requires a nurse to contact her supervisor if she has a concern that a doctor might be violating the

---

4. Emory made this notation when in fact Mr. Miller was not a known admitted homosexual. No one had asked Mr. Miller about his sexual preference. D.I. 98 at B–54, B–97.

hospital's policy against discrimination. The policy then requires the supervisor to contact the doctor. If such contact is not satisfactory, the supervisor should contact the chief of service and the chief of staff who are charged with taking appropriate action. D.I. 92 A–28–29; D.I. 98 at B–69A. Instead, Nurses Burton and Soots chose the less formal mechanism of having Nurse Burton contact Dr. Spicer rather than having Nurse Soots contact Spicer and/or hospital superiors. D.I. 92 at A–22. During that contact Dr. Spicer was noncommittal to Nurse Burton as to whether Dr. Spicer determined to send the patient to another facility due to discriminatory reasons. D.I. 98 at B–20.

Hospital staff, in particular Dr. Emory, also failed to exercise the authority given them to prevent inappropriate treatment. Testimony shows that when an emergency room doctor-employee of Beebe, here Dr. Emory, disagrees with a consulting surgeon's treatment plan or decision to transfer, he has the authority to act to prevent such treatment or transfer. Dr. Emory, who knew the discriminatory reason for plaintiff's transfer, could have called the chief of staff of the emergency room, but he did not. D.I. 98 at B–22A–22B.[5]

Viewing the evidence in the light most favorable to plaintiff, Beebe initiated the course of conduct which resulted in Dr. Spicer's determination not to treat plaintiff. Beebe knew that such decision was made not on the basis of medical knowledge, but for

discriminatory purposes. Beebe took no preventative action, even though such action was not only authorized, but required by hospital policy. It therefore appears plaintiff may be able to prove Beebe failed to provide treatment solely on the basis of Mr. Miller's perceived handicap. Beebe's motion for summary judgment on plaintiff's claim Beebe violated section 504 will be denied.

### 2. Availability of Money Damages Under Section 504

■ Having held plaintiff's claim under section 504 may go forward as to defendant Beebe, the Court must next determine whether money damages are available under section 504. Defendant points out that courts have been divided on the issue of whether equitable remedies are the sole remedies under section 504 or whether money damages are also available.[6] Defendant also correctly points out that the Third Circuit Court of Appeals has not enunciated its position on this issue. D.I. 91 at 11.

Section 505 of the Rehabilitation Act sets forth the remedies available for violations of section 504. That section provides:

(2) The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C. § 2000d et seq.] shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under 794 of this title.

---

5. Dr. Spicer feels his decisions as to treatment cannot be overruled by Beebe employee doctors. D.I. 92 at A–42. Thus, at minimum, there exists a question of fact as to this issue.

6. Compare Eastman v. Virginia Polytechnic Inst. & State Univ., 939 F.2d 204 (4th Cir.1991) (neither compensatory damages for pain and suffering nor punitive damages permitted under section 504); Rhodes v. Charter Hosp., 730 F.Supp. 1383 (S.D.Miss.1989) (money damages not available for claim of emotional distress in action under section 504); Marshburn v. Postmaster General of the United States, 678 F.Supp. 1182 (D.Md.), aff'd, 861 F.2d 265 (4th Cir.1988) (compensatory damages for pain and suffering not available under section 504); Longoria v. Harris, 554 F.Supp. 102 (S.D.Tex.1982) (no damages remedy available under section 504); Shuttleworth v. Broward County, 649 F.Supp. 35 (S.D.Fla.1986) (no compensatory damages for

mental anguish and emotional distress under section 504); Martin v. Cardinal Glennon Memorial Hosp. For Children, 599 F.Supp. 284 (E.D.Mo.1984) (punitive damages and damages for humiliation and embarrassment not available for violation of section 504), and Mark R. v. Board of Educ., 546 F.Supp. 1027 (N.D.Ill.1982), aff'd, 705 F.2d 462 (7th Cir.1983) (tort liability damages not permitted under section 504), with Miener v. Missouri, 673 F.2d 969 (8th Cir.), cert. denied, 459 U.S. 909, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982) (money damages available for violations of section 504); Fitzgerald v. Green Valley Area Educ. Agency, 589 F.Supp. 1130 (S.D.Iowa 1984) (full panoply of remedies available under section 504); Gelman v. Department of Educ., 544 F.Supp. 651 (D.Colo.1982) (compensatory damages available for violations of section 504) and Patton v. Dumpson, 498 F.Supp. 933 (S.D.N.Y.1980) (money damages available under section 504).

29 U.S.C. § 794a (1988). Thus by the terms of the Act, if a federally funded program or activity discriminates solely on the basis of handicap the handicapped person may invoke the remedies of Title VI.[7]

Beebe is correct in its assertion that courts have been divided on the availability of money damages. This split, however, arose prior to the U.S. Supreme Court's decision in *Franklin v. Gwinnett County Pub. Sch.*, —— U.S. ——, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). In that case the Supreme Court held that relief under Title IX is not limited to equitable remedies, but may include money damages for intentional violations of that Act. *Id.* at ——, 112 S.Ct. at 1038. Furthermore, in making this determination, the Court indicated that in a prior opinion, *Guardians Assn. v. Civil Serv. Comm'n*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), a majority of the Justices had determined damages were available for intentional violations of Title VI.

The significance of *Franklin* is twofold. First, because of the relationship among Title IX, Title VI and section 504, the Supreme Court's determination that money damages are available for intentional violations of Title IX indicates that damages are also available for intentional violations of section 504. Second, the analysis used by the Supreme Court to find that money damages are available under Title IX applies to the issue at hand and leads to the same conclusion, money damages are available for intentional violations of section 504.

Section 505 specifies that violations of section 504 are redressable with the same remedies as are provided by Title VI. Whether money damages are available for violations of section 504 thus turns on whether such damages are available for violations of Title VI. The *Franklin* decision indicates that they are. There the Supreme Court held money damages are available for intentional violations of Title IX. This fact alone would indicate such remedy is also available for intentional violations of Title VI since analysis of Title VI and Title IX have developed along concurrent lines. *See Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *NAACP v. Medical Ctr., Inc.*, 599 F.2d 1247 (3d Cir. 1979).

In *Franklin* the Supreme Court also further clarified the issue of availability· of money damages under Title VI. In its discussion of *Guardians Assn. v. Civil Serv. Comm'n*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), the Court pointed out that in *Guardians* "a clear majority [of the Justices] expressed the view that damages were available under Title VI in an action seeking remedies for an intentional violation...." *Franklin*, —— U.S. at ——, 112 S.Ct. at 1035. After *Franklin*, therefore, it is clear that money damages are available for intentional violations of Title VI. Because section 505 specifically states that the remedies available for a violation of section 504 are the same as the remedies available under Title VI, the remedy of damages is also available for intentional violations of section 504.

Second, examination of the reasoning followed by the Supreme Court in determining the availability of money damages for intentional violations of Title IX leads to the same conclusion. The Court repeatedly made clear that the issue before it was, once a right of action has been found to exist, what remedies are available to a court to redress a claimed wrong. The Court first emphasized the longstanding rule that "[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Franklin*, at ——, 112 S.Ct. at 1033 (quoting *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)). It noted that federal courts' ability to provide "any available remedy" included the remedy of money damages. *Id.* The Court opined that federal courts' ability to use "any available remedy" exists regardless of the fact that a statute may not specifically authorize such remedy. *Id.*, —— U.S. at ——, 112 S.Ct. at 1034. The relevant question, according to

---

**7.** Courts have determined that a private right of action exists under section 504. *Strathie v. Department of Transp.*, 716 F.2d 227, 229 (3d Cir.

1983); *NAACP v. Medical Ctr., Inc.*, 599 F.2d 1247, 1258–59 (3d Cir.1979).

the Court, was whether the statute demonstrated that Congress intended to limit courts' ability to provide "any available remedy." Finally, the Court determined that since Congress had legislated, both in enacting Title IX and in subsequently adopting legislation impacting on Title IX, with full knowledge of the judicial presumption in favor of all available remedies and had done nothing to restrict any such remedies, damages were an available remedy for violations of Title IX. *Id.* at ——–——, 112 S.Ct. at 1035–37.

The same analysis applies to the instant case, and the same result obtains. The Supreme Court has reaffirmed the general rule that federal courts may apply all available remedies. *Franklin,* at ——, 112 S.Ct. at 1033. As in *Franklin,* that presumption has not been overcome here where Congress has adopted both section 504 and subsequent legislation impacting on section 504 without demonstrating its intent to limit any particular remedy. Under this presumption, money damages are an available remedy for intentional violations of section 504.

### B. Intentional Infliction of Emotional Distress

Both defendant Spicer and defendant Beebe contend plaintiff's claim for intentional infliction of emotional distress is not supportable. Defendants' basic argument is that although their actions may have been extremely unprofessional, they were not sufficiently offensive to rise to the level of intentional infliction of emotional distress.

■ Delaware recognizes the tort of intentional infliction of emotional distress. *Barker v. Huang,* 610 A.2d 1341, 1351 (Del. Supr.1992). Delaware courts have adopted the formulation of the tort of intentional infliction of emotional distress found in the Restatement (Second) of Torts. *See Mattern v. Hudson,* 532 A.2d 85 (Del.Super.Ct.1987). Section 46 of that treatise provides:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional dis-

tress, and if bodily harm to the other results from it, for such bodily harm.

Restatement (Second) of Torts § 46 (1965).

The key element of the tort of intentional infliction of emotional distress, and the only one called into question by defendants here, is behavior that is outrageous in character and extreme in degree. In determining what constitutes extreme and outrageous conduct Delaware courts have looked to comment d of section 46 of the restatement. *Mattern,* 532 A.2d at 86; *Ortiz v. Brandywine Chrysler-Plymouth, Inc.,* C.A. No. 674, 1977 (Del.Super.Ct. June 26, 1985). This comment provides the following guidance:

Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

Restatement (Second) of Torts § 46 cmt. d (1965). Furthermore, there is some indication that where a relationship of "trust and confidence" exists, the threshold for conduct deemed extreme and outrageous may be somewhat lower than it might otherwise be. *Cummings v. Pinder,* 574 A.2d 843, 845 (Del. Supr.1990) (upholding Superior Court's award for intentional infliction of emotional

distress in favor of client based on certain conduct of attorney in course of representation and indicating attorney's conduct rose to actionable level due in part to relationship of "trust and confidence" between attorney and client).

As the motion before the Court is one for summary judgment, this Court must determine if there is a genuine issue of material fact. Thus, summary judgment will not be granted if a reasonable jury could return a verdict in favor of plaintiff as non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. Because this Court finds a reasonable jury could determine defendants' actions were extreme and outrageous, defendants' motions for summary judgment will be denied.[8]

### 1. *Defendant Spicer*

■ Testimony supports defendant's position that he acted rudely and unprofessionally. Plaintiff describes Dr. Spicer's demeanor as that of a "bully" and "authoritarian," D.I. 84 at B-51, or as "abrupt and rough." D.I. 78 at A-27. During Dr. Spicer's examination of plaintiff, he treated plaintiff "angrily and hostilely," D.I. 78 at A-30, and then in plaintiff's words, "stormed off." D.I. 78 at A-32. These facts in and of themselves would not support a recovery for intentional infliction of emotional distress.

This, however, is not the extent of the conduct about which plaintiff complains. At the base of plaintiff's complaint is his allegation that defendant Spicer, knowing a delay in treatment could cause him irreparable harm, nonetheless refused to treat him, not for medical reasons, but because Spicer unreasonably came to the conclusion that plaintiff was a homosexual, and therefore could have been infected with the AIDS virus.

The record indicates the following were the bases for Spicer's conclusions as to plaintiff's sexual orientation and HIV status: 1) he received a statement, from an unidentified Beebe employee, that someone in the emergency room had "broken wrists"; 2) he received a "whisper" from Dr. Emory that plaintiff was gay; 3) he observed one of plaintiff's companions who Spicer says demonstrated a gay affect; and 4) he determined that since this group of men had been "out on the rocks playing, they're probably gay." D.I. 84 at B-99-100; D.I. 98 at B-81, 92, B-100. Plaintiff denies, and defendants do not controvert, that he ever discussed his sexual orientation with any of the staff at Beebe Medical Center. D.I. 84 at B-54.

Dr. Spicer has admitted that his determination to transfer plaintiff to another hospital rather than treat him at Beebe was motivated by his inability to confirm that plaintiff was HIV negative. He stated that he had to protect the women in the operating room from the possibility plaintiff might have the AIDS virus. D.I. 78 at A-31, A-38. Dr. Spicer decided to refer plaintiff to another care facility even though he knew such transfer would only delay the surgical procedure Dr. Spicer acknowledged must be performed within a specific time of trauma (referred to as the "golden period") to prevent permanent injury. D.I. 78 at A-40; D.I. 84 at B-104. Although defendant Spicer told the plaintiff, and subsequently admitted, that the reason he transferred Mr. Miller rather than treated him was because of Miller's perceived HIV status, the explanation Spicer gave when his orders were questioned that evening was that he "didn't do" tendon repairs. D.I. 84 at B-13. Spicer has subsequently admitted that he had performed thousands of such operations. D.I. 84 at B-94.I. Thus, the apparent falsehood he told Nurse Burton indicates Spicer knew his true reasons for ordering plaintiff's transfer were unacceptable.

This Court is not prepared to say that Dr. Spicer's words and actions in declining to treat Mr. Miller were not extreme and outrageous. It may very well be that at trial the evidence will show defendant Spicer had a medical or other explanation for his determination not to treat Mr. Miller which, even if not commendable, did not rise to a level of being outrageous. At this stage, however, the Court cannot say that no reasonable jury could find the totality of the following actions

---

8. The standard would be the same under Delaware State law. *Mattern*, 532 A.2d at 86 (on motion for summary judgment, court must decide if conduct is extreme and outrageous, but where reasonable people could differ, determination should be left to jury).

were not extreme and outrageous: 1) the manner in which Dr. Spicer refused to render medical treatment to Mr. Miller; 2) the fact that he refused to treat plaintiff, not for some legitimate medical reason, but for unacceptable discriminatory reasons; 3) the fact that he formulated his discriminatory treatment plan primarily on the basis of subjective information such as derogatory comments by Beebe staff members that the patient was homosexual and his leap to the conclusion that Mr. Miller might therefore be infected with the AIDS virus; and 4) the fact that Spicer knew his refusal to treat the plaintiff could cause Mr. Miller serious permanent injury. Defendant Spicer's motion for summary judgment on plaintiff's claim of intentional infliction of emotional distress will, therefore, be denied.

### 2. Defendant Beebe Medical Center

There is no assertion that defendant Spicer was an employee of Beebe Medical Center at the time of the incident at issue. The liability of Beebe therefore arises not from the actions of Dr. Spicer, but from the actions or inactions of the members of Beebe's staff. There are two phases of conduct on the part of Beebe employees which could be found extreme and outrageous. The first is Beebe's labelling of plaintiff as homosexual in a derogatory way to those within the hospital and its later communication of such label to others outside the hospital. The second is Beebe's participation in the transfer of plaintiff for a discriminatory, non-medical reason in violation of the hospital's own policy, without following its own procedures designed to prevent such discrimination, and with knowledge such transfer could result in permanent injury to plaintiff.[9]

First, viewing the evidence in the light most favorable to the plaintiff as non-movant, the record reveals Beebe employees labelled plaintiff a homosexual in a manner that was intended to be derogatory. It was apparent-

ly an unnamed Beebe employee from the emergency room who made an unsuccessful attempt at wit by telling those in Dr. Spicer's operating room that someone in the emergency room had "broken wrists." D.I. 98 at B–100. Then just prior to Dr. Spicer's first encounter with the plaintiff, Beebe employee Dr. Emory "whispered" something to Dr. Spicer. D.I. 98 at B–92. The gist of his communication was that plaintiff was gay. The exact words used by Emory in secret communication are not in the record. Emory had no factual basis for this assertion. D.I. 98 at B–54.

After having successfully labelled plaintiff to those within the hospital, Beebe then broadcast plaintiff's new label to the outside world. Following the decision to transfer plaintiff, Dr. Emory wrote across the chart that would be sent with plaintiff on his course of future treatment, "known admitted homosexual." D.I. 98 at B–18A. All the nurses deposed indicated this was totally out of the ordinary, that none had ever witnessed any such statement on a medical chart before and that no medical reason existed for making such a statement. D.I. 98 at B–4, B–9, B–19, B–24–25, B–60, B–72. It would appear that Beebe employee Dr. Emory wanted every future medical practitioner with whom plaintiff would come in contact to know that plaintiff came with a label which branded him as undesirable to a large portion of our society.

The facts that support the second phase of Beebe's conduct are virtually the same as those that support an action against Beebe for a violation of section 504 of the Rehabilitation Act. Beebe labelled plaintiff as homosexual which lead to Spicer's refusal to treat plaintiff. D.I. 98 at B–92, B–100. Beebe knew that the reason plaintiff was being transferred rather than treated was because of his perceived HIV status. D.I. 92 at A–14–15; 98 at B–25, B–48–50, B–66. Beebe

---

9. Plaintiff makes other miscellaneous claims. For example, plaintiff recounted that the nurse who accompanied him on his flight to the District of Columbia commented that if the helicopter in which they were riding were to stray off its flight path it might be shot down. Plaintiff contends this comment was so outrageous that is constitutes intentional infliction of emotional dis-

tress. Such remarks, do not rise to an actionable level. Similarly, plaintiff's claim, unsupported in the record, that he was left to find his own transportation to George Washington University after the helicopter deposited him at the wrong D.C. hospital does not rise to actionable level and will not be dealt with further.

knew that the delay in treatment caused by the such transfer could result in permanent injury to plaintiff. D.I. 98 at B–43. Armed with this knowledge Beebe employees Emory and Soots had the authority and duty to prevent such discriminatory treatment. These employees chose not to exercise that authority. As to Dr. Emory, he took no action to halt a treatment plan which he knew was based on inappropriate factors and which threatened injury to the plaintiff even though he had the ability to challenge the plan. D.I. 98 at B–22A–22B. Nurse Soots failed to take action to prevent discrimination forbidden by written hospital policy, even though hospital policy and procedure required her to act. D.I. 92 at A–22, A–28; D.I. 98 at B–22A–22B.

A reasonable jury could find outrageous conduct of a doctor, i.e. Dr. Emory, which worked to injure a patient rather than cure him. A reasonable jury could also find outrageous Nurse Soots's failure to take action to prevent the discrimination particularly since her action, or inaction, violated Beebe's own antidiscrimination policies and procedures. In summary, a reasonable jury could find extreme and outrageous Beebe's actions in branding plaintiff as homosexual thereby causing Spicer's refusal to treat plaintiff; Beebe's broadcast of this label both within and without the hospital; Beebe's violations of its own policies and procedures; and Beebe's participation in a scheme to transfer plaintiff rather than treat him, not for legitimate medical reasons, but for inappropriate discriminatory reasons, all in the face of knowledge such transfer was improper and could cause plaintiff permanent injury. Beebe's motion for summary judgment on the issue of liability will therefore be denied.

**10.** Plaintiff also makes passing reference to an express contract between Spicer and Beebe under which Spicer is required to provide emergency medical services to plaintiff. However, plaintiff's complaint does not assert a claim as a third party beneficiary of any such contract. Further, there is nothing in the record to show the existence of such a contract between Beebe and Spicer existed, and there has been no briefing on the issue. Given this state of affairs, the issue will not be treated.

**11.** Section 6851 provides:

### C. Breach of Contract

Defendants request the Court to enter summary judgment in their favor on plaintiff's claim for breach of contract. Plaintiff essentially contends defendants Beebe and Spicer contracted with plaintiff, although not in writing, to treat his injury and that they failed to do so, thereby breaching the asserted contract.[10] Defendants counter summary judgment should be entered in their favor because under Del.Code Ann. tit. 18 § 6851 (1989) no claim for breach of contract can be asserted unless such contract is in writing. The Court agrees that summary judgment should be entered in favor of defendants on plaintiff's claim for breach of contract. While section 6851 standing alone does not preclude the plaintiff's claim, it appears that when the entirety of Chapter 68 is considered, claims for breach of implied contracts between patients and health care providers are prohibited. Defendants' motion for summary judgment on this claim will, therefore, be granted.

The Court finds defendants' motions for summary judgment should be granted based on Title 18, Chapter 68 of the Delaware Code. This basis differs somewhat from defendants' reliance on Del.Code Ann. tit. 18 § 6851 (1989). Both defendants contend that section 6851 prohibits a plaintiff from asserting any breach of contract claim unless a written contract exists.[11] Thus, they argue, because there was no written contract between plaintiff and either Spicer or Beebe, plaintiff's claim for breach of contract must fail. Contrary to defendants' assertion, however, the language of section 6851, in and of itself, does not specifically preclude all breach of contract claims in circumstances where no written contract exists. By its own

No liability shall be imposed upon any health care provider on the basis of an alleged breach of contract, express or implied, *assuring results to be obtained* from undertaking or not undertaking any diagnostic or therapeutic procedure in the course of health care, unless such contract is set forth in writing and signed by such health care provider or by an authorized agent of such health care provider.
Del.Code Ann. tit. 18 § 6851 (1989) (emphasis added).

terms section 6851 negates a breach of contract claim in the absence of a written contract only where a health care provider guarantees that a particular result will be obtained through medical care. The statutory language specifically requires any limitation of liability to concern a contract for services "assuring results to be obtained." Because the instant case is not a claim for breach of contract alleging failure to provide specific results, but is more akin to a claim for failure to perform at all, section 6851 in and of itself is not sufficient to preclude plaintiff's claim.

Section 6851, however, is merely one section of a comprehensive scheme devised by the Delaware legislature to regulate legal claims brought by patients against health care providers. The Court must, therefore, attempt to discern whether Chapter 68, which regulates medical malpractice actions, has an impact on a claim such as the plaintiff has asserted here. Viewed as a whole, Chapter 68 precludes the kind of breach of contract claim Mr. Miller here asserts.

Unfortunately the viability of claims for breach of contract is not made altogether clear by Chapter 68. Examination of that statute reveals the following: The term "breach of contract" is squarely confronted in only two sections of this Chapter regulating health care malpractice. The first is the very first section of the Chapter, section 6801, which provides in part: "(7) 'Malpractice' means any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient." Del.Code Ann. tit. 18 § 6801 (1989). This indicates that Chapter 68, which regulates malpractice liability, is intended to address breach of contract claims. The only other section directly addressing breach of contract claims is section 6851. That section, as discussed above, does not purport to address all claims for breach of contract, but only those in which the contract was one to provide a particular result. The result is this: Chapter 68 purports to regulate malpractice actions based on breach of contract; it specifically permits a breach of contract action where the contract was one assuring results to be obtained so long as that contract was in writing; it does not specifically address whether a breach of contract claim may be brought in other situations. The Court must, therefore, attempt to discern from the statute whether such other claims, specifically claims based upon implied contracts arising out of a patient/health care provider relationship, are permitted under Chapter 68.

In construing Chapter 68 this Court should follow basic tenets of statutory construction. Where, as here, the plain language of the statute is not clear, one turns to the tenet of statutory construction that the judiciary should construe statutes in such a manner as to implement the intent of the enacting legislature. *United States v. DiSantillo*, 615 F.2d 128, 134 (3d Cir.1980). Chapter 68 of Title 18 was enacted with the purpose of providing an atmosphere in which the number of suits and claims of malpractice, as well as the size of judgments and settlements, would be reduced thereby reducing the cost and/or maintaining the availability of medical malpractice insurance for health care providers. This is evidenced by the preamble to Chapter 68 which reads:

WHEREAS, the number of suits and claims for damages both in Delaware and throughout the Nation as well as the necessary costs of defense and the size of judgments and settlements thereon, arising from professional patient care have increased tremendously in the past several years; and

WHEREAS, there has been a tremendous increase in the cost of liability insurance coverage for health care providers in Delaware, and in some instances the withdrawal of liability insurance companies from the business of insuring health care providers in Delaware, endangering the ability of the citizens of Delaware to continue to receive quality health care as well as adequate and just compensation for negligent injuries; and

WHEREAS, the General Assembly determines it is necessary to make certain major modifications to its current legal system as it relates to health care malpractice claims if the citizens of Delaware are to continue to receive a high quality of

health care while still assuring that any person who has sustained bodily injury or death as a result of a tort or breach of contract on the part of a health care provider resulting from professional services rendered, or which should have been rendered, can obtain a prompt determination of adjudication of that claim and receive fair and reasonable compensation from financially responsible health care providers who are able to insure their liability, under a strictly construed fault principle as now, at a cost which is not prohibitive and does not lead to the problems and practices described above, while still maintaining Delaware's overall legal system as to health care malpractice claims except as modified by this legislation.

60 Del.Laws 373 (1975). Chapter 68 was meant to limit, not expand, a plaintiff's ability to pursue a claim for damages against a health care provider. In construing Chapter 68 this Court should attempt to implement that purpose.

A second cannon of statutory construction dictates that a statute should be read to give meaning to all its sections and not render any section a nullity. *Mountain States Tel. and Tel. Co. v. Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985). Permitting a cause of action for breach of an implied contract would allow plaintiffs to circumvent one of the central sections of Chapter 68, thereby rendering that section a nullity.

One of the key features of Chapter 68 is found in section 6853. Under that section, a plaintiff cannot prevail in an action for medical negligence, except in certain narrowly specified circumstances, unless he or she presents expert medical testimony on the issues of standard of care and causation.[12] Further, section 6854 narrowly circumscribes the pool of experts qualified to testify.[13]

Through these sections the Delaware legislature has deliberately narrowed plaintiffs' means of recovering damages against a health care provider. If a plaintiff were permitted to bring a claim based on an implied contract, he or she could circumvent the requirements of these sections thereby avoiding the strictures imposed by the legislature. For example, under section 6853 a plaintiff who claimed a doctor improperly performed some medical procedure could not prevail on a suit sounding in tort if he or she had failed to retain a qualified medical expert. If suits based on implied contracts were permitted, such plaintiff could simply recast the complaint so that it sounded in contract regardless of the fact that no express contract had ever been created by the parties. Because the action would technically no longer be one for medical negligence, the need for expert medical testimony would be obviated and the case could go forward. If this Court were to recognize the theory plaintiff here asserts, every patient/health care provider relationship would give rise to an implied contract and thus a cause of action on which the plaintiff could prevail without the need for

12. Section 6853 specifies:

No liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death except that such expert medical testimony shall not be required if a malpractice review panel has found negligence to have occurred and to have caused the alleged personal injury or death and the opinion of such panel is admitted into evidence....

13. Section 6854 provides:

(a) No person shall be competent to give expert testimony as to applicable standards of skill and care unless such person is familiar with that degree of skill ordinarily employed in the community or locality where the alleged malpractice occurred, under similar circumstances, by members of the profession practiced by the health care provider; provided, however, that any such expert witness need not be licensed in the State.

(b) Any physician who has been in the active practice of medicine or surgery for at least the past 5 years and who currently practices in the State or within a state contiguous to the State and within a radius of 75 miles of the Capitol of the State shall be presumed to be competent to give expert medical testimony as to applicable standards of skill and care, if it shall be established that the degree of skill and care required of the expert in the locality where the expert practices or teaches is of the same or equivalent standard as the skill and care employed in the community or locality where the alleged malpractice occurred.

Del.Code Ann. tit. 18 § 6854 (1989).

174

expert testimony. In this way the same plaintiff could proceed against the same health care provider for the same wrong without fulfilling the requirements of section 6853. The Court recognizes the remedy for breach of an implied contract would differ from an action sounding in tort. Nonetheless, the Court declines to construe Chapter 68 in a manner that would do violence to one of its central provisions.

The Court holds Chapter 68 prohibits a claim for breach of an implied contract. By so holding, this Court furthers the intent of the legislature to limit a plaintiff's ability to pursue a health care provider for damages, it construes all the sections of Chapter 68 so as to be harmonious and it prevents circumvention of one of the Chapter's key provisions. Defendants' motions for summary judgment on the issue of liability will, therefore, be granted as to plaintiff's claim for breach of contract.

## V. *CONCLUSION*

Defendant Spicer's motion for summary judgment on the issue of liability will be granted as to plaintiff's claim under 29 U.S.C. § 794. Beebe's motion as to this claim will be denied. Money damages are a remedy available to plaintiff on his claim against Beebe for alleged violation of 29 U.S.C. § 794 (1988). Both defendants' motions for summary judgment will be denied as to plaintiff's claim for intentional infliction of emotional distress. Summary judgment on the issue of liability will be granted to defendants with respect to plaintiff's claim for breach of contract. An appropriate order will issue.