John H. MATTERN, Jr., Plaintiff,

v.

Robert J. HUDSON, et al., Defendants.

Superior Court of Delaware,
Sussex County.

Submitted: April 6, 1987.
Decided: April 28, 1987.

Robert C. Wolhar, Jr., of Wolhar & Gill, Georgetown, for plaintiff.

Eugene H. Bayard, of Wilson, Halbrook & Bayard, Georgetown, for defendants.

## MEMORANDUM OPINION

CHANDLER, Judge.

This is the Court's decision on the motion for summary judgment filed by defendants Robert J. Hudson, Paul E. Ewell, Eugene Murray, Rita L. Murray and Eugene Parker, individually and trading as Sea Air Associates (hereinafter "Hudson"). Plaintiff John M. Mattern, Jr. filed this lawsuit on October 15, 1982 alleging harassment and intentional infliction of extreme emotional distress. Although Hudson concedes the record is in dispute as to the facts underlying the cause of action, he insists that the evidence—even taken in a light most favorable to the plaintiff—does not establish a cause of action for intentional infliction of emotional distress. Mattern contends the record contains material disputes of fact and therefore should not be disposed of by summary adjudication.

■ No Delaware court has had the opportunity to adopt the tort of intentional infliction of emotional distress. However, the United States District Court for Delaware, applying Delaware law, has held that this state would do so. *Correa v. Pennsylvania Mfrs. Ass'n Ins. Co.*, D.Del., 618 F.Supp. 915 (1985). I find the reasoning of the federal case persuasive. *See also Ortiz v. Brandywine Chrysler–Plymouth, Inc.*, Del.Super., C.A. No. 674, 1977, Balick, J. (June 26, 1985); *Avallone v. Wilmington Medical Center, Inc.*, D.Del., 553 F.Supp. 931 (1982). These courts have applied the tort as defined by the Restatement (Second) of Torts, which provides:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. Restatement § 46(1).

... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.... There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.... It is only where there is a special relation between the parties ... that there may be recovery for insults not amounting to extreme outrage. Restatement, § 46, comment d. *Brandywine Chrysler*, pp. 2–3.

Liability only arises under the tort if the emotional distress inflicted is indeed severe.

... The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.... Restatement, § 46, comment j; *Brandywine Chrysler*, p. 4.

■ Hudson correctly asserts that it is the court's responsibility to determine whether the defendant's conduct is so extreme and outrageous as to permit recovery. *Brandywine Chrysler*, p. 2; Restatement, § 46, comment h. Of course, where reasonable men might differ, it is for the jury to determine whether the conduct has been sufficiently extreme and outrageous to result in liability. *Brandywine Chrysler*, pp. 2–4. On a motion for summary judgment, the moving party (Hudson) must demonstrate that even when the facts are taken in a light most favorable to the non-moving party (Mattern), he is entitled to prevail as a matter of law. *Matas v. Green*, Del.Super., 171 A.2d 916 (1961). The facts in this case are as follows:

■ As of the date of his deposition, Mattern was 75 years old and in poor health. At the time of his dispute with Hudson, he had just had his 37th radium treatment for cancer, had high blood pressure and a plate for a hernia. He had had his prostate removed. He also had a bad knee, which required surgery, and walked with a cane. Mattern suffered a heart attack in 1968 and a partial stroke in 1977. He retired from Standard Oil in 1965 and became a permanent resident of Sea Air Mobile City, a 54 acre trailer park in Rehoboth Beach, Delaware, in 1978 or 1979. On May 16, 1983 he moved to Piney Glade, 101 Hemlock Lane in Sussex County, Delaware. (Mattern's Deposition, Docket # 23, pp. 1–7, 35 ("M# "); Plaintiff's Appendix p. 1).

On October 9, 1982, a letter was distributed by Hudson to the residents of Sea Air. (M–8). The letter provided:

Dear Tenant:

Sea Air Mobile City has been purchased by Sea Air Associates. The purchasers are in the process of preparing documentation that will convert the park from a rental park to a Co-operative Community. This means that you can now become the owner of your lot.

The sellers of the property have been most helpful and have agreed to permit us the use of their office facilities so that we can further explain the advantages of Co-operative ownership. Sea Air Associates have arranged to staff same and have installed a new telephone line. Please call 1–302–227–1803 for an appointment.

Very truly yours,
Sea Air Associates

The letter was signed by Robert J. Hudson, General Partner. (A–16; M–9).

Mattern testified that even before the incident upon which he bases his cause of action, Sea Air Associates used scare tactics to convince many residents that they had to buy into the cooperative. Many residents were upset as they believed they could not afford to move and yet could not afford the thousands of dollars required to buy into the cooperative. (M–33). On October 11, 1982 Mattern was approached by 30 or 40 residents and he advised them to "band together" and "fight this." A tenant's meeting was held on October 12 and Mattern was elected chairman of the Sea Air Tenants Association. (M–10, 18). This fact was publicized in the park itself, as well as in the newspaper and on television. Personnel at the front office were also aware of Mattern's election. (M–18). On October 13, Hudson called Mattern and said he wanted to talk to him in his office, but Mattern was ill and the meeting was postponed until the next day. (M–12).

Mattern assumed that the meeting would concern the cooperative and as chairman of the tenant's association he brought the group's publicity chairman, Don Knott, and its attorney, Robert Wolhar, with him to the meeting. Wolhar also brought a law clerk, Fred Baker with him. (M–19). When Mattern arrived for his appointment, however, Hudson was immediately belligerent and nasty, demanding to know what Mattern was doing there even though Mattern was there at Hudson's invitation. (M–14). Hudson then demanded, "Well, I want to know if you are going to buy that lot down there." When Mattern protested that a co-op involved a lease, not a sale, Hudson retorted, "Don't tell me what it [a co-op] is. I am asking you: "Do you want to buy that lot?" (M–14).

When Mattern again protested that he would be leasing, not buying, Hudson hollered, "Well, I want to know if you want to buy the lot, and I will give you until tomorrow noon." Next, Hudson picked up a couple of papers and said, "In fact, I have a contract right here with a check that the lady is going to buy your lot." When Mattern again protested that the woman would be leasing the lot, Hudson said, "Well, I have changed my mind. I will give you until 4:00 this afternoon to make up your mind. Otherwise, I am going to sell your lot." (M–15). The price asked for the lot was $22,500. (M–43).

When Wolhar asked to see the documents, Hudson refused and said, "Furthermore, if you don't want the lot, I am going to move you out of here and set your mobile home up on the road." Mattern protested, saying "You can't do that," and Hudson responded, "We can do anything we want. We have 50 million dollars in back of us. Anything we want to do, we can do." (M–15, 16). Then Hudson hollered nastily for everyone to get out. Hudson jumped up from behind the desk, rushed over and slammed the door open with such force that the chain on it caused the door to bounce back. He was so angry, flailing his arms about, that Mattern was afraid to walk past him to get out the door. (M–34, 35).

Later, employees of Sea Air Associates came to Mattern's lot with a plat and pointed and gestured at the property and returned still later by car to look around again. By this time Mattern was ready to call the State Police. (M–41). Mattern is now positive that he was singled out for abuse because he was chairman of the tenant's committee and if Hudson could convince Mattern to "sign up, being the chairman, that other people in the park would follow suit." (M–54).

Mattern was frightened and upset by the incident. He testified that he could not remember what, if anything, Wolhar had said at the meeting because he was too upset at the time. Despite the fact that Mattern knew that Hudson had no right to do the things he threatened, Mattern was still frightened. He testified: "He was going to move me out in the highway. A threat is a threat. I had better sense to know that he couldn't do it and all, but these things go against you.... When people are threatening you—We can do any damn thing we want, because we have 50 million dollars—what would you think? I

knew I could call the State Police, but that would be a whole lot of confrontation." He was very much intimidated by Hudson, despite his attorney's presence because "[i]t [the intimidation] was all pointed at me." (M–20, 21). He also testified that he still gets "uptight" when he thinks about the incident, although he has tried to follow his doctor's advice to "calm down." (M–41).

The fact that two witnesses, Wolhar and Baker, partially corroborate Mattern's testimony only serves to strengthen his argument. (*See* Baker's Deposition, Docket # 29, pp. 23, 29; Wolhar's Deposition, Docket # 27, pp. 15, 19, 20, 21, 27 and 31). Mattern has presented evidence from which a jury could find that Hudson's actions were both extreme and outrageous, and that Mattern's distress was both severe and reasonable under the circumstances. Restatement, § 46, comments d and j; *Brandywine Chrysler, supra.* The fact that Hudson's testimony tells an entirely different story, demonstrates that there are material issues of fact still in dispute. (*See generally*, Hudson's Deposition, Docket # 19). It is not proper to grant a motion for summary judgment when "it seems desirable to inquire thoroughly into [the facts] in order to clarify the application of the law to the circumstances." *Ebersole v. Lowengrub,* Del.Super., 180 A.2d 467 (1962). *See also Correa,* 618 F.Supp. at 928. Therefore, defendant's motion for summary judgment is hereby DENIED.

IT IS SO ORDERED.