# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| MARGARET DAYTON and EVERETT JONES, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. N17C-08-100 CLS |
| WILLIAM COLLISON, | ) ) ) | |
| Defendant. | ) | |

Date Submitted: April 10, 2020
Date Decided: June 22, 2020

## MEMORANDUM OPINION

Decision after Bench Trial
**Verdict for Plaintiffs in part.**
**Verdict for Defendant in part.**

Teresa J. Tabah, Esquire, Newark, Delaware, Attorney for Plaintiffs.

Donald L. Gouge, Jr., Esquire, Donald L. Gouge, Jr., LLC, Wilmington, Delaware, Attorney for Defendant.

**SCOTT, J.**

1

*Rebellious subjects, enemies to peace,*
*Profaners of this neighbour-stained steel,—*
*Will they not hear?*[1]

## I. INTRODUCTION

This is the Court's decision following a three-day bench trial regarding a dispute between neighbors. As with most disputes between neighbors, the facts of this case demonstrate that both parties have conducted themselves in a manner that can be described as: "anything but neighborly." Between the parties are allegations of trespass, destruction of property, invasion of privacy, intentional infliction of emotional distress, malicious prosecution, and abuse of process.

## II. FINDINGS OF FACT

Margaret Dayton and Everett Jones ("Plaintiffs") own 18 Squirrel Lane in Newark, Delaware. Plaintiffs have resided at 18 Squirrel Lane since 2004. William Collison ("Defendant") owns 19 Squirrel Lane in Newark, Delaware. Defendant has resided at 19 Squirrel Lane since 2009. The properties at 18 and 19 Squirrel Lane are located next to one another.

Although the parties lived next to one another peacefully for several years, the relationship between Plaintiffs and Defendant soured in 2017. From that point forward a petty feud has consumed the once peaceful cul-de-sac on Squirrel Lane.

---

[1] William Shakespeare, *Romeo and Juliet* Act 1 Sc.1, lns. 101–103.

Both parties have antagonized one another, photographed one another, and used profane language with one another. Neither party's hands are clean.

## A.    City of Newark Parkland and Code Violations

The rear boundaries of both Plaintiffs' and Defendant's properties abut City of Newark parkland ("Parkland"). The Parkland contains a hiking trail and a creek. It sits in a FEMA floodplain area and the riparian buffer for this floodplain area encroaches onto 18 and 19 Squirrel Lane. Tom Zaleski, superintendent for the City of Newark Parks and Recreation Department, explained the City's policies for maintaining the Parkland area. In general, the owners of private property abutting the Parkland are not responsible for landscaping in the Parkland. In April 2017, Plaintiff Jones contacted the City for the first time to report that contractors in the Parkland had piled logs behind 18 Squirrel Lane. As Mr. Zaleski explained, the logs should have been spread throughout the Parkland rather than stacked up in a pile. Defendant did not hire this contractor, but Plaintiff Jones believes Defendant told the contractors to pile the logs behind 18 Squirrel Lane.

After April 2017, Plaintiff Jones began contacting the City frequently to complain about Defendant. Over the span of a year and a half, Plaintiff Jones made between 10 and 15 complaints to the City about Defendant; these complaints alleged a broad range of activities supposedly carried out by Defendant:  damaging the

Parkland; hanging toilet seats that faced Plaintiffs' property; severing a drainage line; and filling a drain box.

A number of employees from the City of Newark have visited 18 and 19 Squirrel Lane in response to Plaintiff Jones' complaints. Aaron Mueller, a utility inspector for the City of Newark, visited the properties over two dozen times to address drainage issues. Ethan Robinson, the deputy director of Public Works and Water Resources for the City of Newark, also visited the properties to address drainage issues. Finally, Tom Zaleski, superintendent for the City of Newark Parks and Recreation Department, visited the properties in response to Plaintiff Jones' complaints about activity in the Parkland.

Plaintiff Jones believes that each of his complaints about Defendant were based on actual violations of the City Code. And although City officials advised Plaintiff Jones that it is the City who determines if the Code has been violated,[2] Plaintiff Jones has been displeased with the City's response. Rather than issue violations to Defendant, the City has issued warnings to Defendant for the various conditions about which Plaintiff Jones complained. Plaintiff Jones has sent hundreds of emails[3] to the City of Newark urging a more serious response to—in Plaintiff

---

[2] *See* Def.'s Ex. 3 (Letter to Plaintiff Jones from Max Walton); Trial Transcript at 130:1–13, *Dayton v. Collison*, N17C-08-100 CLS (Del. Super. Nov. 6, 2019) (cross-examination of Plaintiff Jones).

[3] At trial, the Court asked the parties to agree on the number of emails that Plaintiff Jones has sent to the City; the parties never presented a number to the Court.

Jones' view—Defendant's alleged violations of the City Code. Some of these emails contained threats to involve the media if the City did not respond in a stronger manner. For example, Plaintiff Jones once threatened to make a video "go viral" if the City did not respond to his email within five minutes. On another occasion, Plaintiff Jones threatened to go to the *News Journal* or ABC News. Although Plaintiff Jones acknowledged at trial that Defendant has remedied most of the complained-of conditions, Plaintiff Jones still wants the City hold Defendant accountable for Defendant's actions.

## B. Draining 18 and 19 Squirrel Lane

Ronald Kraatz owned 19 Squirrel Lane before he sold the property to Defendant. In 2007, after obtaining Mr. Kraatz's approval, Plaintiff Jones reconfigured the drainage system for the water runoff of both 18 and 19 Squirrel Lane. Plaintiff Jones installed a drain box underground where the drain lines for 18 and 19 Squirrel Lane met. Plaintiffs and Defendant agree that this drain box was almost entirely on 19 Squirrel Lane.

At some point, Defendant removed the drain box. After removing the drain box, Defendant filled the resulting hole with a variety of substances—dirt, bricks, and a concrete slab—and created a berm. This berm and the drainage issues caused

---

Plaintiffs have not disputed the representation that Plaintiff Jones sent "hundreds" of emails to the City. Therefore, the Court finds that Plaintiff Jones sent hundreds of emails to the City.

by the removal of the drain box were the subject of many visits to 18 and 19 Squirrel Lane by officials of the City of Newark.

### C.    The Maple Tree

The parties agree that the trunk of a large maple tree ("Maple Tree") sits on the front corner of Plaintiffs' property. Because of the tree's massive size, some of the Maple Tree's branches were hanging over Defendant's driveway. Defendant wanted to trim the Maple Tree so that its branches no longer hung over his driveway because Defendant believed that the Maple Tree was dropping objects—like acorns and small branches—that were damaging his vehicles.

In June 2017, while Plaintiffs were on vacation, Defendant hired Mitsdarfer Brothers Tree Service ("Mitsdarfer Brothers") to trim the Maple Tree so that its branches no longer hung over Defendant's driveway. Defendant knew from his contact with a City of Newark employee that he could prune the Maple Tree up to the property line. Accordingly, Defendant advised Mitsdarfer Brothers not to cross the property line and to trim the Maple Tree up to the property line; this instruction was corroborated by the testimony of Fred and Matthew Mitsdarfer and an invoice for the tree cutting provided by Mitsdarfer Brothers. Defendant was present when Mitsdarfer Brothers trimmed the Maple Tree. Although he watched Mitsdarfer Brothers trim the Maple Tree, Defendant did not decide which branches should be cut, where the branches should be cut, or what type of apparatus should be used for

6

cutting the branches; employees of Mitsdarfer Brothers independently made these decisions.

Fred Mitsdarfer, owner of Mitsdarfer Brothers, stated that, when trimming a tree between two properties, it his usual practice to: 1) keep his employees off of the neighboring property; 2) use a bucket truck when cutting the branches so that no employee needs to walk onto the neighboring property; and 3) trim boundary-crossing trees up to six inches away from the actual property line. Because Defendant gave Mitsdarfer Brothers clear instructions to stay off of Plaintiffs' property, Mitsdarfer Brothers followed its usual practice and trimmed the Maple Tree to six inches from what it believed to be the property line and used a bucket truck to reach the branches. The employees of Mitsdarfer Brothers used visual cues to estimate the location of the property line. The Court finds that employees of Mitsdarfer Brothers did not enter Plaintiffs' property when they cut the Maple Tree.

According to Russell Carlson, an arborist, Mitsdarfer Brothers pruned approximately forty percent of the Maple Tree's crown. Instead of properly cutting the branches back to a crotch, Mitsdarfer Brothers made "heading cuts" to the Maple Tree. As Mr. Carlson explained, these "heading cuts" will cause long-term damage to the Maple Tree because a heading cut introduces decay into a tree limb and can structurally weaken the tree limb. Over time, the Maple Tree will try to sprout new limbs; per Mr. Carlson, if these new limbs are attached to rotting wood, then there

is a risk that the new limbs will fall off of the Maple Tree. According to Mr. Carlson, the manner in which the Maple Tree was pruned caused $4,890 in damages to the Maple Tree and shortened its lifespan.

### D. Boundary between 18 and 19 Squirrel Lane

At some point in time, Plaintiffs hired a land survey company to mark the boundaries of 18 Squirrel Lane. The land survey company put wooden stakes in the ground to mark the boundaries. By his own admission, Plaintiff Jones moved the wooden stakes after the land survey company left. It is unclear whether Plaintiff Jones moved the wooden stakes to put them back in their previous location after someone else moved them or to correct the land survey company's mistake, but it is clear that Plaintiff Jones moved the wooden stakes. After the wooden stakes were placed, Defendant ran a string between the properties to give himself an estimate of where the property line was located. No company has surveyed both 18 and 19 Squirrel Lane.

On November 2, 2018, Corporal Walker of the Newark Police Department responded to a trespassing complaint at 18 Squirrel Lane. After some investigation, Corporal Walker decided not to issue a charge for criminal trespassing. Corporal Walker testified that the boundary between 18 and 19 Squirrel Lane was unclear.

Plaintiffs' Exhibits 8 and GG show a man standing on Plaintiffs' property. Plaintiff Jones did not know the man's identity but knew that the man worked for

8

Mitsdarfer Brothers. Fred Mitsdarfer also could not identify the man, but he also knew that the man was one of his employees because the man appeared to be helping lower a tree branch from one of the trees in Defendant's backyard.

### E. Relationship between Plaintiffs and Defendant

It is clear that Plaintiffs and Defendant are not on good terms. Each party has acted in an antagonistic manner towards the other. Although Plaintiffs and Defendant have not been involved in a physical altercation, the two have had a number of heated exchanges.

#### 1. Plaintiff Jones' Conduct

The Court received testimony about threatening statements Plaintiff Jones has allegedly made to Defendant. Although the Court is not convinced of the truth of *all* of these allegations, the Court believes that Plaintiff Jones did not choose his words carefully when speaking to Defendant. The Court finds that Plaintiff Jones threatened Defendant with litigation and has, on several occasions, cursed at Defendant.

Additionally, Plaintiff Jones threatened contractors hired by Defendant. Matt Mitsdarfer, son of Fred Mitsdarfer and an employee at Mitsdarfer Brothers, testified that, when he was cutting the Maple Tree in 2018,[4] Plaintiff Jones aggressively told

---

[4] Although Matt Mitsdarfer testified that this incident with Plaintiff Jones happened in 2017, the Court believes that Matt Mitsdarfer got his dates confused.

9

Matt to get off of his property, cursed at Matt, and threatened Mitsdarfer Brothers's license. After Plaintiff Jones threatened Matt Mitsdarfer, Defendant confronted Plaintiff Jones, and the two men raised their voices at each other. According to Matt Mitsdarfer, it seemed like the City of Newark would always appear whenever Mitsdarfer Brothers was doing work for Defendant. On another occasion, Plaintiff Jones told employees of Mitsdarfer Brothers that they could not park in the street. Matt Mitsdarfer witnessed Plaintiff Jones take photographs of him and other Mitsdarfer Brothers employees while they were doing work for Defendant.

Plaintiff Jones has also contacted employees of the City of Newark multiple times to report Defendant's actions. Plaintiff Jones contacted the City about Defendant's actions in 2017 and also about construction projects that Defendant undertook prior to 2017. Based on responses to his FOIA requests, Plaintiff Jones believed Defendant did not have the necessary permits when he: installed a hot tub between 2013 and 2015; expanded his driveway in 2009; and installed double casement windows in 2009. Plaintiff Jones did not contact the City about these permits until at least 2017. The Court received no evidence about whether or not these projects were permitted; the status of these projects is irrelevant here.

On November 2, 2018, Plaintiff Jones called the Newark Police Department to report Defendant for trespassing. Plaintiff Jones showed the responding officer, Corporal Walker, a video depicting—according to Plaintiff Jones—Defendant

10

standing on Plaintiffs' property. After speaking with both parties, Corporal Walker decided not to charge Defendant with criminal trespassing because the property lines were not clear and Defendant's alleged incursion onto Plaintiffs' property was not enough for a criminal trespassing charge. It was Corporal Walker's understanding that Plaintiff Jones did not want to press charges against Defendant; instead, Plaintiff Jones wanted Corporal Walker to give Defendant a warning about his conduct.

In July 2017, Plaintiffs installed a motion-activated video camera on their property because they were concerned about Defendant's conduct. The video camera faces the right side of Plaintiffs' property—the side of the property which abuts 19 Squirrel Lane—and the rear of Plaintiffs' property. Plaintiffs installed this video camera so that it would face the area between 18 and 19 Squirrel Lane where the drain box was located; as a result, the video camera also captures the back-left corner of 19 Squirrel Lane and the Parkland behind the properties. Since Plaintiffs installed this camera, it has captured hundreds of videos of Defendant and his fiancée, Nancy Ellicot. The camera captures video and audio. In the videos admitted into evidence from this camera, Defendant can be heard speaking to Ms. Ellicot and other individuals; Plaintiffs were not a party to the conversations in these videos.

Defendant and Ms. Ellicot are aware of Plaintiffs' video camera. Plaintiffs' Exhibits GG, YY, and AAA show Defendant taking photographs of Plaintiffs' video camera. Additionally, Ms. Ellicot overheard Plaintiff Jones tell Defendant that

Plaintiff Jones has been filming Defendant for the past seven years. In November 2018, Plaintiffs installed another camera that faces south. Ms. Ellicot believes that this second camera points directly at Defendant's front and back doors.

Finally, Plaintiff Jones placed four or five "No Trespassing" signs[5] on his property. All of these signs were placed along the property line between 18 and 19 Squirrel Lane. Plaintiff Jones eventually moved one of these "No Trespassing" signs back into his flower bed because the sign might have been on Defendant's property. Additionally, after Defendant removed the drain box, Plaintiffs installed new drain pipes on their property. These pipes connect to Plaintiffs' gutters and expel water towards 19 Squirrel Lane.

### 2. Defendant's Conduct

The Court received testimony about statements Defendant has allegedly made to Plaintiff Jones. Like the allegations against Plaintiff Jones, the Court is not convinced of the truth of *all* of these allegations. However, the Court finds that Defendant has, on at least one occasion, cursed and raised his voice at Plaintiff Jones.

---

[5] Both parties introduced into evidence photos of these so-called "No Trespassing" signs. Pls.' Ex. 5; Def.'s Ex. 9. Although the signs in the photos in evidence clearly say "POSTED," the remaining text on the sign is not clear. Because both parties agree that these signs are "No Trespassing" signs, the Court will also refer to these signs as "No Trespassing" signs. *See* Trial Transcript at 99:8–23, 100:1–3, *Dayton v. Collison*, N17C-08-100 CLS (Del. Super. Nov. 8, 2019).

12

Defendant's actions caused drainage issues for both 18 and 19 Squirrel Lane. Defendant removed the drain box where the drain lines for both 18 and 19 Squirrel Lane converged. Additionally, Defendant tried—several times—to build a berm between the properties. Defendant's removal of the drain box and addition of a berm caused drainage issues for 18 and 19 Squirrel Lane.

Between two trees on his own property, Defendant hung several toilet seats facing Plaintiffs' property. Defendant strung the toilet seats up in a row and drew frowning and smiling faces on them. At least a week passed before Defendant took the toilet seats down. Additionally, Defendant has, at some point, also installed a camera on his property. Plaintiff Jones believes that this camera is aimed at Plaintiffs' library doors.

### F. Defendant's Health and Well-Being

Beginning in 2017 and continuing throughout this litigation, Defendant's physical health and mental well-being have declined. First, Defendant's diabetes has worsened. Defendant was diagnosed with diabetes in 2012. On June 3, 2016, Defendant's family physician, Dr. Sarah Mullins, characterized Defendant's diabetes as "under control." At that time, Defendant was taking Invokana to control his diabetes. In August 2017, Defendant began having trouble sleeping, panic attacks, and anxiety; Defendant continued to experience anxiety and high levels of stress between 2017 and 2019. By 2018, Defendant's diabetes was deemed

13

"uncontrolled." On June 3, 2019, Dr. Mullins prescribed Defendant insulin injections to control Defendant's diabetes because the anti-diabetes pills were no longer sufficient.

Defendant's mental well-being has also declined. On August 23, 2017, Defendant informed Dr. Mullins that he was experiencing anxiety, trouble sleeping, and panic attacks. According to Dr. Mullins, this was the first time Defendant had complained of these issues; Dr. Mullins noted that Defendant's face was flushed and that he was upset and angry. Defendant explained to Dr. Mullins that he was upset about events at home because he was being sued by his neighbor and he was having verbal conflicts with this neighbor. Defendant also informed Dr. Mullins that he was afraid to leave his home because he felt that he was being filmed by his neighbor. On December 17, 2017, Dr. Mullins diagnosed Defendant with acute anxiety. On June 7, 2018, Dr. Mullins noted that Defendant's distress was daily and his stress was unrelenting; Defendant was unable to leave the house to take walks. Defendant informed Dr. Mullins that he was overwhelmed by the stress of the lawsuit, upcoming depositions and court events, and confrontations with his neighbor. On December 27, 2018, Dr. Mullins recorded that Defendant was misusing alcohol as a coping mechanism. Defendant informed Dr. Mullins that he felt extremely stressed about the litigation and that he was worried about litigation costs, damage to his property, and confrontations with his neighbor. On June 3, 2019, Dr. Mullins

14

recorded that Defendant's alcohol misuse was in remission and diagnosed Defendant with major depressive disorder. Defendant informed Dr. Mullins that he continued to experience stress because of the litigation.

In Dr. Mullins' opinion, Defendant's anxiety, stress, and depression were caused by Plaintiffs' actions. Dr. Mullins did not differentiate Plaintiffs' act of filing this lawsuit from Plaintiff Jones' verbal confrontations with and filming of Defendant. However, it is clear that Dr. Mullins concluded that Plaintiffs' acts, in the aggregate, caused Defendant's anxiety, stress, and depression.

In addition, Defendant's anxiety and his problems with Plaintiffs worsened Defendant's physical health. Dr. Mullins concluded that, because of Defendant's anxiety and problems with Plaintiffs, Defendant's diabetes worsened. Additionally, Dr. Mullins concluded that Defendant's anxiety and his problems with Plaintiffs elevated Defendant's blood pressure. Between 2011 and 2019, however, Defendant's blood pressure fluctuated: sometimes it would be high and sometimes it would be low. Even before litigation began in 2017, Defendant's high blood pressure was a concern for Dr. Mullins—especially because Defendant was taking medicine to lower his blood pressure.

### G.    Litigation

On August 8, 2017, Plaintiffs filed their Complaint in this matter; Plaintiffs alleged claims of Continuing Nuisance, Destruction of Property, Prescriptive

15

Easement, and Slander and sought injunctive relief and compensatory and punitive damages. On August 18, 2017, the New Castle County Sheriff served Defendant with process. On January 24, 2018, the Court dismissed Plaintiffs' equitable claims against Defendant for lack of jurisdiction. The Court advised Plaintiffs that the Court of Chancery has jurisdiction over equitable claims.[6]

On December 11, 2018, the Court granted Plaintiffs leave to file an Amended Complaint; Plaintiffs filed their Amended Complaint on that same day. Plaintiffs' Amended Complaint alleged claims of Continuing Nuisance, Destruction of Property, Trespass, and Slander and sought compensatory and punitive damages from Defendant. In their Amended Complaint, Plaintiffs alleged that Defendant: removed trees and partially deforested the Parkland; impeded the drainage of 18 Squirrel Lane into the Parkland; installed an unpermitted underground storage tank; removed a drain pipe and clogged the remaining pipe; altered the grade of Defendant's property; destroyed certain trees on Plaintiffs' property; failed to respect the property boundaries; and cleared the Parkland of naturally growing plants.

On December 24, 2018, Defendant filed his Amended Answer and Counterclaims. Defendant alleged claims of Trespass to Timber, Trespass to Land,

---

[6] Subsequent to trial, Plaintiffs filed a complaint with the Court of Chancery seeking equitable relief. Verified Complaint, *Jones v. Collison*, No. 2020–0149– (Del. Ch. Mar. 31, 2020).

16

Defamation, Invasion of Privacy, Malicious Prosecution/Abuse of Process, Emotional Distress and Harassment and sought punitive, compensatory, and special damages from Plaintiffs. In support of his counterclaims, Defendant alleged that Plaintiffs: removed bushes from Defendant's property; trespassed onto Defendant's property and installed a drain box; directed water onto Defendant's property; made false statements about Defendant to City officials; and maliciously instituted these legal proceedings. Plaintiffs filed their Answer to the Amended Counterclaim on November 5, 2019. Defendant withdrew his trespass to timber and defamation counterclaims before trial.

After the Court partially granted Defendant's Motion for Summary Judgment on September 24, 2019, Plaintiffs' case was limited to two claims: 1) Destruction of Property with regard to the Maple Tree, and 2) Trespass to Land. This Court held that Plaintiffs lacked standing to bring a claim for public nuisance for Defendant's alleged violations of the City of Newark Code because the City has sole authority over these violations. The Court also held that Plaintiffs failed to provide sufficient evidence to support their claim of private nuisance and most of their claims of destruction of property. Additionally, the Court found that Plaintiffs did not meet the statutory requirements for treble damages under 25 *Del. C.* § 1401, Timber Trespass. Plaintiffs withdrew their claim for Slander at oral argument on June 19, 2019.

17

A three-day bench trial in this matter took place on November 6, 2019. In lieu of closing arguments, the Court requested Post-Trial Briefs from the parties.

## III. DISCUSSION

By the time of the trial, Plaintiffs' claims were limited to destruction of property in relation to the Maple Tree and trespass to land. Defendant dropped his timber trespass and defamation counterclaims prior to trial. At trial, Defendant pursued his counterclaims for trespass to land, invasion of privacy, intentional infliction of emotional distress, malicious prosecution, and abuse of process. The Court will address each claim in turn.

### A. Trespass Claims

Plaintiffs allege that Defendant trespassed on their property by physically entering their property, blocking the flow of natural water from Plaintiffs' property to Defendant's property, and building a berm partially on Plaintiffs' property. Plaintiffs further allege that Mitsdarfer Brothers trespassed when pruning the Maple Tree. As a remedy, Plaintiffs seek compensatory damages for Defendant's causing water and debris to stand on Plaintiffs' property when he removed the drain box; Plaintiffs also seek nominal damages and punitive damages for Defendant's trespass, which Plaintiffs argue was intentional and retributive. In response, Defendant argues that Plaintiffs' trespass claim should fail because the property boundary is not clear and, alternatively, Plaintiffs were not actually damaged by any trespass that

18

occurred. Defendant also argues that the Court should not award compensatory damages or punitive damages because neither type of damages are warranted based on the evidence presented at trial.

Defendant alleges that Plaintiffs trespassed on his property when Plaintiffs entered Defendant's property without permission, installed a drain box on Defendant's property, and tampered with Defendant's hot tub. Further, Defendant alleges that Plaintiffs trespassed on his property when they directed their drain pipe towards Defendant's property. Defendant acknowledges that he sustained no actual damages from Plaintiffs' trespass and asks this Court to award nominal damages. In response, Plaintiffs argue that Defendant's trespass claims are not supported by any physical evidence and instead are based on Defendant's speculation about what occurred while Defendant was on vacation in Florida.

In Delaware, to prove an intentional trespass to land claim the claimant must show: 1) that the claimant has lawful possession of the land; 2) that the opposing party entered the claimant's land without consent or privilege; and 3) damages.[7] Entry onto the claimant's property must be intentional, but the claimant does not need to prove any wrongful intent.[8] It is sufficient for the claimant to show that the

_____

[7] *Williams v. Manning*, 2009 WL 960670, at *8 (Del. Super. Mar. 13, 2009) (citing *Cochran v. City of Wilmington*, 77 A. 963, 963–64 (Del. Super. 1909)).
[8] *Newark Square, LLC v. Ladutko*, 2017 WL 544606, at *2 (Del. Super. Feb. 10, 2017).

19

actor intended to be upon the particular piece of land in question, regardless of whether the actor intended to trespass.[9]

At the outset, the Court notes that it did not receive any evidence about Defendant's actions causing water and debris to stand on Plaintiffs' property nor did the Court receive evidence about the "natural flow" of water between 18 and 19 Squirrel Lane; accordingly, the Court did not consider these allegations when rendering its decision. Plaintiffs allege that Defendant trespassed on their property numerous times in 2017 when Defendant built the berm between the properties. Defendant allegedly set foot onto 18 Squirrel Lane, placed some dirt on 18 Squirrel Lane, and crossed onto 18 Squirrel Lane with his wheelbarrow. Defendant's alleged incursions on Plaintiffs' property are—at most—several inches. Plaintiffs produced photographic evidence in support of their claims. These photos show Defendant standing to the right of a lone post from an old split rail fence on Plaintiffs' property.

In contrast, Defendant produced no photographic evidence in support of his claim that Plaintiffs trespassed on his property to install a drain box and to tamper with his hot tub. Defendant's allegations rely solely on the testimony of Defendant and Ms. Ellicot. Defendant presented no evidence to corroborate his trespass claim; Defendant and Ms. Ellicot simply stated that these acts occurred and named Plaintiff Jones as the suspected actor. By itself, the speculative testimony of Defendant and

---

[9] *Manning*, 2009 WL 960670, at *8.

20

Ms. Ellicot is not sufficient to support Defendant's trespass claim. Thus, Defendant's counterclaim for trespass must fail.

Although the Court received much testimony about trespass, neither party has proven where the boundary line between the properties is located by a preponderance of the evidence. When, as is the case here, the parties are alleging an incursion onto their property within "inches" of the property line, it is imperative for the Court to have a clear understanding of the properties' boundaries. The boundary line between 18 and 19 Squirrel Lane is not clear. After visiting both properties, even Corporal Walker could not identify the boundary line between 18 and 19 Squirrel Lane. Additionally, Plaintiff Jones moved boundary stakes that were placed by a survey company after the survey company left; thus, the survey stakes are not a reliable marker of the boundary line. Without a clear understanding of the location of the boundary line between 18 and 19 Squirrel Lane, the Court is left to speculate as to whether Defendant or Plaintiffs actually entered the other party's property. The Court will not so speculate.

Finally, this Court received into evidence a photograph of a Mitsdarfer Brothers' employee on Plaintiffs' property.[10] Unlike the other evidence before the Court, this photograph shows that the employee was *substantially* within Plaintiffs' property boundary because the man is standing to the left of the lone split rail fence

---

[10] Pls.' Ex. 8, GG.

21

post. The Court and the parties do not know this man's identity, but the Court does know that this man was not a party to the instant action. Plaintiffs argue that Defendant should be vicariously liable for any Mitsdarfer Brothers' employee that trespassed on their property; as discussed more fully below, Defendant is not vicariously liable for the actions of any employee of Mitsdarfer Brothers.

Neither Plaintiffs or Defendant have proven the first and second elements of their trespass claim: that they possessed the land that the opposing party unlawfully entered. Accordingly, both Plaintiffs' and Defendants' trespass claims must fail.

## B. Plaintiffs' Destruction of Property Claim

Plaintiffs allege that Defendant destroyed their property when Defendant hired Mitsdarfer Brothers to trim the Maple Tree. Plaintiffs contend that Defendant is vicariously liable for Mitsdarfer Brothers actions because Mitsdarfer Brothers was Defendant's agent. As a remedy, Plaintiff asks this Court to award compensatory and punitive damages. In response, Defendant argues that he is not vicariously liable for the actions of Mitsdarfer Brothers because he did not exert the requisite amount of control over Mitsdarfer Brothers's actions. In the alternative, Defendant argues that he had a right to trim the Maple Tree up to the property line and that any alleged trespass by Mitsdarfer Brothers when trimming the Maple Tree was de minimis.

When a plaintiff claims that a defendant is vicariously liable for the actions of a third-party, the plaintiff must show that the defendant and the third-party are in a

principal/agent relationship.[11] One common type of principal/agent relationship is the master/servant relationship; in a master/servant relationship, the servant is the agent of the principal (the master) and is subject to physical control by the principal.[12] Determining whether an agency relationship exists depends on the particular facts of a case.[13] The Delaware Supreme Court has recognized Section 220 of the *Restatement (Second) of Agency* as authoritative guidance for whether an actor is a servant or an independent contractor.[14] To determine if an actor is a servant or an independent contractor, a court should consider the following "matters of fact":

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business.[15]

If, after considering the applicable "matters of fact," the court finds that the actor is an independent contractor, the court must then determine if the actor is an agent-

---

[11] *Fisher v. Townsends, Inc.*, 695 A.2d 53, 57 (Del. 1997).
[12] *Id.* at 58.
[13] *Murphy v. Bayhealth, Inc.*, 2005 WL 578823, at *3 (Del. Super. Feb. 4, 2005).
[14] *Fisher*, 695 A.2d at 59.
[15] *Restatement (Second) of Agency* § 220(2) (Am. Law Inst. 2019).

23

independent contractor or a non-agent independent contractor.[16] The general rule is that an independent contractor is not an agent of the contractee.[17] However, if the contractee's control or direction dominates the manner or means of the work performed, then the independent contractor will be considered an agent of the contractee.[18]

In the instant case, Defendant hired Mitsdarfer Brothers to trim back the branches of the Maple Tree so that the branches no longer hung over Defendant's driveway. Defendant instructed Mitsdarfer Brothers not to enter Plaintiffs' property. Other than Defendant directing Mitsdarfer Brothers to trim the Maple Tree up the property line, Defendant did not control any aspects of Mitsdarfer Brothers' work. Mitsdarfer Brothers is in the business of trimming trees and have established practices on how to trim trees that are between two properties. Fred Mitsdarfer instructed his employees to use a bucket truck to trim the Maple Tree because that was his practice when trimming trees near a property boundary. Mitsdarfer Brothers brought their own tools and used their own equipment to trim the Maple Tree. Only

---

[16] In *Fisher*, the Delaware Supreme Court recognized that there are non-agent independent contractors and agent-independent contractors. *Fisher*, 695 A.2d at 58.
[17] *See E.I. Du Pont De Nemours & Co. v. I.D. Griffith, Inc.*, 130 A.2d 783, 784 ("A requirement that the work be performed according to standards and specifications imposed by the owner is not sufficient to establish the degree of control necessary to make a presumably independent contractor the agent of the owner.").
[18] *Fisher*, 695 A.2d at 61; *Randazzo v. Cochran*, 2018 WL 1037455, at *3 (Del. Super. Feb. 22, 2018).

the employees of Mitsdarfer Brothers trimmed the Maple Tree and cleared away the branches that fell to the ground. Defendant paid Mitsdarfer Brothers for performing the job of trimming the Maple Tree. Defendant did not control the manner and means by which Mitsdarfer Brothers trimmed the Maple Tree. For example, Defendant did not tell Mitsdarfer Brothers how to cut the branches or where to cut each branch; these decisions were made solely by Mitsdarfer Brothers. Based on all of the facts presented to the Court, the Court finds that Mitsdarfer Brothers was an independent contractor and not Defendant's agent.

Mitsdarfer Brothers is not Defendant's agent. Thus, Defendant is not vicariously liable for any damage Mitsdarfer Brothers may have caused to the Maple Tree. Plaintiffs have offered no evidence that Defendant destroyed the Maple Tree. Therefore, Plaintiffs' claim of destruction of property must fail.

### C.    Defendant's Invasion of Privacy Counterclaim

Defendant alleges that Plaintiffs invaded his privacy when they audio and visually recorded Defendant without his consent via a motion-activated camera. Defendant contends that Plaintiffs' filming of Defendant constituted a violation of 11 *Del. C.* § 2402(a). As a remedy, Defendant seeks damages for harm to his privacy, for his mental distress, and for his other injuries; Defendant also seeks punitive damages. In response, Plaintiffs argue that 11 *Del. C.* § 2402(a) prohibits intentionally taping a two party conversation and not incidentally taping a two party

25

conversation using a motion-activated camera. Plaintiffs further argue that Defendant did not have an expectation of privacy along the property line outside of his home and thus any intrusion the camera may have made cannot be considered highly offensive. Plaintiffs also maintain that it is Defendant who has acted in a highly offensive manner because Defendant's camera points directly into their library while Plaintiffs' camera does not point at Defendant's home at all.

Delaware has adopted the four invasion of privacy torts outlined by Professor Prosser: 1) intrusion upon seclusion; 2) publication of private facts; 3) false light; and 4) misappropriation of physical likeness.[19] Defendant's counterclaim properly sits within the realm of the first privacy tort—intrusion upon seclusion. To prove a claim of intrusion upon seclusion, Defendant must show that Plaintiffs intentionally intruded, physically or otherwise, upon his solitude or seclusion or his private affairs or concerns in a manner that would be highly offensive to a reasonable person.[20] The key element of this tort is *intrusion*; namely, Defendant must show that Plaintiffs intruded into a private place or otherwise intended to invade a private seclusion that Defendant has "thrown about his person or affairs."[21]

---

[19] *Barker v. Huang*, 610 A.2d 1341, 1349 (Del. 1992).
[20] *Id.* at 1350.
[21] *Lee ex rel. B.L. v. Picture People, Inc.*, 2012 WL 1415471, at *3 (Del. Super. Mar. 19, 2012).

Under 11 *Del. C.* § 2402(a)(1), it is illegal for a person to "intentionally intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept any wire, oral or electronic communication."[22] Section 2402 is part of Delaware's wiretap statute. Because a wiretap is an "intrusion into [an] individual's constitutionally recognized right of privacy," the meaning of § 2402 should be strictly construed.[23] As defined by statute, the term "intercept" means the "acquisition of . . . the contents of any . . . oral . . . communication through the use of any electronic, mechanical or other device."[24] An "oral communication" is an "oral communication uttered by a person made while exhibiting an expectation that such communication is not subject to interception and under circumstances justifying such expectation."[25]

Based on the evidence presented at trial, Plaintiffs intercepted at least three of Defendant's oral communications. Of the four videos Plaintiffs entered into evidence, three were captured by Plaintiffs' motion-activated camera. All three of the videos contain audio and visual content. One video shows Defendant using a wheelbarrow to place bricks and speaking with someone off-camera. The next video shows Defendant speaking with workers on his property. The final video shows

---

[22] 11 *Del. C.* § 2402(a)(1)
[23] *State v. Jock*, 404 A.2d 518, 520 (Del. Super. 1979).
[24] 11 *Del. C.* § 2401(10).
[25] *Id.* § 2401(13).

27

Defendant and Ms. Ellicot looking and pointing at something on Plaintiffs' property from 19 Squirrel Lane. In all three videos, the camera recorded Defendant's conversation with another person. Defendant did not consent to these recordings. All of these communications occurred between individuals who were on Defendant's property, and Plaintiffs were not a party to any of these conversations.

Plaintiffs acted intentionally. Even though the camera is motion-activated, this does not mean that Plaintiffs' recordings were unintentional. Plaintiffs intentionally purchased a motion-activated camera with both audio and visual capabilities. Plaintiffs intended for the camera to record Defendant because they purchased the camera in response to Defendant's alleged acts of trespassing and property damage. Plaintiffs already had a still-motion camera on their property that they used to photograph deer in the Parkland; Plaintiffs' sole intention for the motion-activated video camera was to record Defendant.

Plaintiffs violated § 2402 by intentionally intercepting oral communications of Defendant with their motion-activated video camera. This violation of § 2402 constitutes an "intrusion" of Defendant's privacy.[26] Although Defendant did not have these conversations inside his home, he had these conversations with individuals on his own property. Defendant spoke at a normal volume; he did not

---

[26] *See Jock*, 404 A.2d at 520 ("Wiretap statutes, implicating as they do an intrusion into the individual's constitutionally recognized right of privacy, should generally be strictly construed.").

28

invite others to listen to his conversations by shouting. Moreover, Defendant was in his backyard, rather than his front yard, when he had these conversations. Based on these facts it is clear that Plaintiffs recorded Defendant's private conversations without his permission: this is an intrusion.[27]

In addition to the violation of § 2402, Plaintiffs also took a substantial number of photographs and videos of Defendant. Defendant alleged that Plaintiffs took 2000 photographs of Defendant and 250 videos of Defendant. Plaintiffs clarified that they produced all of the photographs from their still camera—which was installed in 2007—in discovery and that between 200 and 400 of these photographs were of activities in the Parkland. Only a dozen of the photographs showed Defendant allegedly trespassing on Plaintiffs' property. It is clear that Plaintiffs have a large cache of videos and photographs of Defendant. Between the motion-activated still camera, the motion-activated video camera, and the Plaintiffs' own personal cameras, Plaintiffs have utilized several devices to capture Defendant's actions. Plaintiffs have filed, at most, 15 complaints with the City about Defendant's actions; Plaintiffs have also filed this lawsuit. The number of photographs and videos that Plaintiffs have of Defendant is disproportionate to the number of actual allegations against Defendant. Although Plaintiffs may have initially set out to capture

---

[27] *See Beckett v. Trice*, 1994 WL 710874, at *6 (Del. Super. Nov. 4, 1994) ("To intrude means to enter without invitation or welcome.").

Defendant engaging in unlawful conduct, at some point Plaintiffs' actions became more akin to surveillance of Defendant. The Court finds that, in addition to the violation of § 2402, the unconsented-to surveillance of Defendant carrying out lawful activities on his own property also constitutes an intrusion into Defendant's privacy.

All the aforementioned intrusions into Defendant's privacy were intentional. As discussed above, Plaintiffs intentionally purchased a motion-activated video camera to capture Defendant as he engaged in allegedly destructive activity. Plaintiffs also intentionally took photographs and videos of Defendant with their mobile devices. Plaintiffs intended to record Defendant while Defendant carried out lawful activities on his own property.

The Court finds that Plaintiffs intruded into Defendant's solitude. Although Defendant was not inside his home when Plaintiffs photographed and videotaped him, Defendant was still on his own property in a majority of those images. Furthermore, Defendant was in his backyard when he was photographed, videotaped, and recorded. Unlike a front yard, which is visible to the public and in which there exists a limited license to enter and walk to the front door, a backyard is more private; typically, only homeowners and their guests are permitted to enter a backyard. Defendant did not expect to have individuals who he did not invite onto his property to see into his backyard and to hear conversations which he carried out

in a normal voice with people who he had invited onto his property. Although Plaintiff Jones has suggested that anyone walking the Rittenhouse Trail[28] can see Defendant's entire backyard, the Court has not received sufficient evidence to support this claim. Accordingly, the Court finds that Defendant's backyard is an area of solitude.

Finally, the Court finds that Plaintiffs' intrusion into Defendant's privacy was in a manner that would be highly offensive to a reasonable person. Because Plaintiffs' camera is motion-activated, the camera recorded Defendant each time Defendant walked along his property within the range of the camera. This camera recorded Defendant's movements and conversations whenever he was on a specific portion of his own property. The camera did not differentiate between lawful and unlawful actions; instead, the camera recorded all types of activities and conversations. Furthermore, the sheer number of images Plaintiffs have of Defendant on his own property is intrusive. The Court finds that a reasonable person would be highly offended if their neighbor trained a motion-activated camera at a portion of their property for the sole purpose of recording their activities. This reasonable person would be even more offended if this camera captured over a

---

[28] The Rittenhouse Trail is a public hiking trail that runs through the Parkland area behind 18 and 19 Squirrel Lane. The Court does not know the distance between the Rittenhouse Trail and 18 and 19 Squirrel Lane nor does the Court know the visibility conditions from the trail.

hundred images of them. In addition, a reasonable person would be highly offended if this motion-activated camera also recorded their private conversations with people on their own property—an act which has even been criminalized by the Delaware legislature.[29]

Based on the evidence presented at trial, the Court finds by a preponderance of the evidence that Plaintiffs intentionally intruded upon Defendant's seclusion in a manner that would be highly offensive to a reasonable person. Therefore, Defendant has proven his counterclaim of invasion of privacy. Plaintiffs damaged Defendant by intruding into his privacy. Plaintiffs also damaged Defendant by causing Defendant mental distress, as demonstrated by Dr. Mullins' testimony that Defendant was afraid to leave his home because he did not want to be filmed by his neighbor and that Defendant developed depression and anxiety because of Plaintiffs' conduct.

### D. Defendant's Intentional Infliction of Emotional Distress Counterclaim

Defendant alleges that Plaintiffs intentionally inflicted emotional distress upon him by constantly reporting Defendant to the City, filming Defendant, and threatening Defendant physically and with litigation. Defendant alleges that Plaintiffs' conduct caused him severe emotional distress. As a remedy, Defendant

---

[29] 11 *Del. C.* § 2402(a)(1).

ask this Court to award damages to compensate him for his emotional distress and for the monetary expenses which he has incurred. In response, Plaintiffs argue that Dr. Mullins' testimony and diagnosis is unreliable because Dr. Mullins based her medical opinion on information that she received from Defendant only. Plaintiffs contend that Defendant's anxiety could have been caused by the "litany" of other ailments from which Defendant suffered. Plaintiffs also argue that they did not harass Defendant by complaining to the City because all of their concerns were legitimate. According to Plaintiffs, Defendant was the aggressor.

In Delaware, an individual is liable for intentional infliction of emotional distress if that individual intentionally or recklessly engages in extreme and outrageous conduct that causes another to suffer severe emotional distress.[30] Liability will be found only where the "conduct is so outrageous and extreme in degree that it exceeds the bounds of decency and is regarded as intolerable in a civilized community."[31] Extreme and outrageous conduct is more than mere insults, indignities, threats, and annoyances.[32] Liability attaches only when an individual

---

[30] *Adams v. Aidoo*, 2012 WL 1408878, at *9 (Del. Super. Mar. 29, 2012); *Mattern v. Hudson*, 532 A.2d 85, 85 (Del. Super. 1987).
[31] *Tekstrom, Inc. v. Savla*, 2006 WL 2338050, at *12 (Del. Super. July 31, 2006); *see also Restatement (Second) of Torts* § 46 cmt. d (Am. Law Inst. 2019) ("Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'").
[32] *Mattern*, 532 A.2d at 86.

33

suffers *severe* emotional distress; in other words, "the law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it."[33]

Plaintiffs' conduct was not extreme and outrageous. Plaintiffs filmed and photographed Defendant, had a few verbal confrontations with Defendant, threatened Defendant with litigation, contacted the City about Defendant, and filed the instant case against Defendant. Even when considered together, these acts do not "go beyond all possible bounds of decency" nor are these actions "utterly intolerable in a civilized community."[34] Although these actions can be considered indignities, threats, or annoyances, they are not "atrocious" or "intolerable."[35] Because the Court finds that Plaintiffs' conduct was not extreme and outrageous, Defendant's counterclaim of intentional infliction of emotional distress must fail.

### E.  Defendant's Malicious Prosecution Counterclaim

Defendant alleges that Plaintiffs maliciously prosecuted him when Plaintiffs initiated the instant legal proceedings. Defendant points out that Plaintiffs' original complaint sought remedies which the Superior Court cannot award—injunctive and

---

[33] *Id.*

[34] *Restatement (Second) of Torts* § 46 cmt. d.

[35] *Farmer v. Wilson*, 1992 WL 331450, at *5 (Del. Super. Sept. 29, 1992) ("The tort [of IIED] does not exist to provide a cause of action against someone who exercises poor judgment. It exists to hold accountable someone who does something atrocious and intolerable.").

equitable relief—and that Plaintiffs' Amended Complaint raised issues that were within the sole authority of the City of Newark. Defendant argues that he prevailed on the claims for equitable relief because the Court dismissed these claims. Defendant further argues that he prevailed on the claims that were within the City's jurisdiction because the Court granted summary judgment for Defendant on those claims. Finally, Defendant argues that Plaintiffs' actions were with malice because Plaintiff Jones "had it out for" Defendant. As a remedy, Defendant asks this Court to award damages for his emotional distress and legal fees. In response, Plaintiffs argue that the action has not resolved in Defendant's favor and that Defendant's medical records show an improvement in his health, not a deterioration. Plaintiffs further argue that they would have never filed this lawsuit if Defendant had not acted improperly.

Delaware courts disfavor claims of malicious prosecution; thus, such claims are assessed with careful scrutiny.[36] A claimant alleging malicious prosecution must show: 1) institution of civil proceedings; 2) without probable cause; 3) with malice; 4) termination of the proceedings in the claimant's favor; and 5) damages which were inflicted upon the claimant.[37] When evaluating a malicious prosecution claim, a court examines a litigant's intent at the initiation of the legal action.[38]

---

[36] *Nix v. Sawyer*, 466 A.2d 407, 411 (Del. Super. 1983).
[37] *Aidoo*, 2012 WL 1408878, at *13; *Nix*, 466 A.2d at 411.
[38] *Aidoo*, 2012 WL 1408878, at *13.

The Court finds that Plaintiffs did not institute the action against Defendant with malice. "Malice requires evidence that the action was taken by [Plaintiffs] with a wrongful or improper motive or with wanton disregard of [Defendant's] rights."[39] Plaintiffs' motives were not wrongful, even if some of Plaintiffs' claims were misplaced. Throughout trial, Plaintiff Jones maintained that his complaints to the City were borne of a desire to spur the City to take action against Defendant and of a desire to make Defendant stop trespassing and damaging the Parkland. Even though Plaintiffs should have sued the City for allegedly failing to take proper action against Defendant, Plaintiffs sued Defendant because they wanted Defendant to stop; this is not an improper purpose. Furthermore, to obtain the equitable relief that they sought, Plaintiffs should have filed their claims in the Court of Chancery. Although the Superior Court could not provide Plaintiffs with the equitable relief which they sought, Plaintiffs' purpose in filing the action was proper: they wanted Defendant to stop trespassing. Finally, it is clear that there is bad blood between Plaintiffs and Defendant. However, "there is authority that if [Plaintiffs'] purpose was otherwise a proper one the addition of the incidental fact that he felt indignation or resentment toward [Defendant] will not make [Plaintiffs] liable."[40] Therefore, Plaintiffs did not institute the instant proceedings with malice.

---

[39] *Scott v. Moffit*, 2019 WL 3976068, at *6 (Del. Super. Aug. 20, 2019).
[40] *Nix v. Sawyer*, 466 A.2d 407, 412 (Del. Super. 1983) (citing *Kaye v. Pantone, Inc.*, 395 A.2d 369, 372 (Del. Ch. 1978)).

Because the Court finds that Plaintiffs did not institute the present civil proceedings maliciously, Defendant's counterclaim for malicious prosecution must fail.

### F. Defendant's Abuse of Process Counterclaim

Defendant alleges that Plaintiffs abused the legal process when they allowed Plaintiff Jones to testify to matters that were not before the Court and called witnesses whose testimony had nothing to do with Plaintiffs' case-in-chief. Defendant contends that Plaintiffs brought this lawsuit out of a desire to punish Defendant. As a remedy, Defendant asks this Court to award damages for his emotional distress, monetary losses, and legal fees. In response, Plaintiffs argue that a claim of abuse of process requires coercion, which—according to Plaintiffs—was not present in the instant case. Plaintiffs further argue that it is Defendant's fault that they filed the instant case because Defendant acted improperly and, subsequently, refused to remedy those improper actions.

Unlike malicious prosecution claims, which focus on a party's initiation of the legal process, abuse of process concerns perversions of the legal process after it has been issued.[41] The elements for a claim of abuse of process are: 1) an ulterior motive; and 2) a willful act in the use of the legal process that is not proper in the

---

[41] *BRP Hold Ox, LLC v. Chilian*, 2018 WL 573648, at *6 (Del. Super. Oct. 31, 2018).

37

regular conduct of the proceedings.[42]  A claimant alleging abuse of process must show "some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process."[43]  Some form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, must be shown; in other words, a form of extortion is required.[44]

The Court finds that Plaintiffs did not have an ulterior motive when they filed the lawsuit or when Plaintiff Jones testified at trial.  As discussed above, Plaintiffs had a proper purpose in filing the lawsuit:  to have Defendant stop his allegedly damaging activities.  Plaintiffs were not using this lawsuit to seek to obtain a collateral advantage.  There was no extortion or coercion.  Plaintiffs filed the lawsuit and permissibly proceeded with the case through trial.  Although Plaintiff Jones did testify about certain matters that were outside the scope of this litigation, the Court notes that counsel for Defendant also elicited testimony from Plaintiff Jones about that which Defendant now claims was "outside the scope" of the litigation.[45]  For example, on cross-examination, counsel for Defendant questioned Plaintiff Jones at some length about an underground storage tank on Defendant's property, a matter

---

[42] *Aidoo*, 2012 WL 1408878, at *13; *Nix*, 466 A.2d at 412.
[43] *Aidoo*, 2012 WL 1408878, at *13; *Nix*, 466 A.2d at 412.
[44] *Chilian*, 2018 WL 573648, at *6.
[45] *See* Def.'s Post-Trial Answering Br. 22 (identifying the underground storage tank as one example of Plaintiff Jones testifying to matters not before the Court).

38

which Defendant now argues was outside the scope of this litigation.[46] Plaintiff Jones had not testified about the tank prior to Defendant's questions. Because Plaintiffs did not have an ulterior motive in filing the lawsuit or when Plaintiff Jones testified at trial, Defendant's counterclaim for abuse of process must fail.

## IV.   CONCLUSION

Defendant has proven his invasion of privacy counterclaim by a preponderance of the evidence. The following claims were not proven by a preponderance of the evidence: Plaintiffs' trespass and destruction of property claims, and Defendant's trespass, intentional infliction of emotional distress, malicious prosecution, and abuse of process counterclaims. Accordingly, the Court issues a verdict partially in Plaintiffs' favor and partially in Defendant's favor. It is hereby **ORDERED:**

1.   The court enters a verdict in favor of Defendant on Plaintiffs' trespass claim.

2.   The court enters a verdict in favor of Defendant on Plaintiffs' destruction of property claim.

3.   The court enters a verdict in favor of Plaintiffs on Defendant's trespass counterclaim.

---

[46] *Id.*

4. The court enters a verdict in favor of Defendant on Defendant's invasion of privacy counterclaim. Plaintiffs must pay Defendant $5,000 for damaging Defendant's privacy and causing Defendant mental distress.

5. The court enters a verdict in favor of Plaintiffs on Defendant's intentional infliction of emotional distress counterclaim.

6. The court enters a verdict in favor of Plaintiffs on Defendant's malicious prosecution counterclaim.

7. The court enters a verdict in favor of Plaintiffs on Defendant's abuse of process counterclaim.

_____

**The Honorable Calvin L. Scott, Jr.**